**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Scott Andrew SHOVEA, Gebbie Hugh
Robba, Stephen Howard Gaias, Jr.,
Defendants-Appellants.**

Nos. 77–1078, 77–1079 and 77–1184.

United States Court of Appeals,
Tenth Circuit.

Submitted May 8, 1978.

Decided July 27, 1978.

Rehearing Denied in No. 77–1078
Sept. 13, 1978.

Jonathan L. Olom, Denver, Colo. (Stanley H. Marks, Denver, Colo., on brief) for appellant Shovea.

Edward L. Kirkwood, Asst. Federal Public Defender, Denver, Colo. (Daniel J. Sears, Federal Public Defender, Denver, Colo., on brief) for appellants Robba and Gaias.

Edward W. Nottingham, Asst. U. S. Atty., Denver, Colo., for appellee (Joseph F. Dolan, U. S. Atty., Denver, Colo., with him on brief for Shovea and Robba, Cathlin Donnell, U. S. Atty., Denver, Colo. (Interim) with him on brief for Gaias).

Before BARRETT, and McKAY, Circuit Judges, and BRATTON, District Judge.*

BARRETT, Circuit Judge.

Scott Shovea (Shovea), Gebbie Robba (Robba) and Stephen Gaias (Gaias) appeal their jury convictions of conspiracy to manufacture and possess with intent to distribute methamphetamine, a schedule II controlled substance, in violation of 18 U.S.C.A. § 2 and 21 U.S.C.A. § 841(a)(1).

Appellants were originally indicted with Geoffrey Hungerford (Hungerford). At the commencement of the trial, the Government dismissed its charges against Hungerford. Thereafter, a mistrial was declared as to Gaias. The trial proceeded as to Shovea and Robba. They were convicted. Subsequent thereto, Gaias was tried individually and convicted. A detailed recitation of the pertinent facts should facilitate our review.

Gaias originally ordered a chemical, phenyl–2–proponone (p–2–p), a primary precursor of methamphetamine, from a New York chemical company under the name of "Jay Edwards." The order was submitted on behalf of "Royce International, 315

* Of the District of New Mexico, sitting by designation.

Broadway, Port Jefferson, New York." Thereafter federal agents set up a controlled delivery for the chemical.

On September 17, 1976, Gaias was observed by the agents picking up the chemical, after which he was followed to 315 Broadway, a house in a residential area. Shortly thereafter, Gaias was observed exiting the house carrying a suitcase very carefully. He held the suitcase flat, rather than by the handle. Two agents then followed Gaias to an airport. While en route, Gaias drove in excess of the posted speed limits in an elusive manner. Once at the airport, Gaias boarded a plane which flew to Denver. The agents flew to Denver on the same plane. They kept Gaias under surveillance at all times. Gaias arrived in Denver during the early morning hours of September 18, 1976. He was met there by Robba. Gaias and Robba drove from the airport to a residence located at 3352 West Gill Place. Agents followed them to the residence. After Robba and Gaias entered the house, the agents placed an electronic tracking device on Robba's car. Sporadic surveillance of the residence continued September 18 through September 20, 1976.

Gaias' suitcase did not arrive on his incoming flight but it did arrive in Denver later that morning. Prior to its arrival, Gaias filled out a lost luggage claim wherein he listed Robba's name and requested that the suitcase be delivered to 3352 West Gill Place upon its arrival. The suitcase was X-rayed following its arrival at the Denver airport. The X-rays revealed that four bottles were in the suitcase. The agents did not open the suitcase. Pursuant to Gaias' request, the suitcase was delivered to 3352 West Gill Place.

Shortly after the suitcase was delivered, Gaias and Robba were observed by the agents leaving the residence and proceeding to Royce International where they, together with Shovea, loaded and unloaded boxes from their vehicles. Robba and Shovea were both employed at Royce International at that time. Investigation had established that someone allegedly associated with Royce International had, within the prior four months, ordered various chemicals and glassware from a scientific company, all of which could be utilized in the manufacture of methamphetamine.

On the evening of September 20, 1976 agents detected a strong odor of ether emanating from the 3352 West Gill Place residence. Shovea was observed leaving the residence, walking down the street, looking in all directions, and then returning to the residence. The agents, based on their prior experience, associated the strong odor of ether and Shovea's suspicious movements with the clandestine manufacturing of methamphetamine. Accordingly, when all of the defendants were observed leaving the residence carrying boxes which they loaded into Hungerford's car, the three agents arrested them.

After the arrests were effected, the cars and the residence were secured while a search warrant was obtained. The affidavit in support of the requested warrant stated in part: "Fellow agent Larry Lamberson stated that he checked with the airport authorities and found that the suitcase carried by Gaias was X-rayed and 4 bottles were seen inside." [R., Vol. IV, at 8.] The warrant was issued. A subsequent search of the cars and residence disclosed concentrated liquid methamphetamine and numerous articles used in its manufacture.

Prior to trial, a hearing was held on defendants' motions to suppress evidence allegedly seized as a result of the X-ray search of the suitcase as well as the evidence seized by searching the cars and the residence. The trial court ruled that the X-ray search of the suitcase constituted an unlawful search violative of Gaias' Fourth Amendment rights. A mistrial was granted as to Gaias. The trial court ruled, however, that the evidence of the airport X-ray search was admissible against Shovea and Robba; that evidence seized by search of the cars and the residence was admissible against all of the defendants; and that the search of the cars and residence was not tainted by reference in the affidavit alluding to the X-ray search of the suitcase which disclosed the four bottles.

After the court had ruled on the various motions to suppress, Shovea and Robba proceeded to trial. In the course of their trial, the Government developed the conspiracy in detail. A forensic chemist testified for the Government. He identified the chemical seized as methamphetamine and stated that the volume seized would produce approximately 100,000 doses. At the close of the Government's case, Shovea and Robba elected not to present any evidence. Verdicts of guilty were subsequently returned against them.

Thereafter, Gaias was tried. Prior to trial, the court ruled that the *Wong Sun* doctrine did not preclude admission of the evidence obtained via issuance of the search warrant inasmuch as the information relative to the X-ray of the suitcase contributed little to the search of the residence, and that the Government "could easily have established probable cause for the search of the house had there been no search at the airport." [R., Vol. I, p. 10.] At the conclusion of the Government's case, Gaias moved for acquittal. The motion was denied. Thereafter, the defense rested without introducing any evidence. Gaias was convicted.

### I.

Robba contends that the trial court erred (1) by allowing the Government to introduce evidence obtained by exploitation of the X-ray search of the suitcase, and (2) by allowing the admission of evidence obtained by exploitation of the illegal surveillance precipitated by the use of an electronic tracking device placed on his vehicle.

### (a)

Robba claims that the trial court erred in allowing the Government to introduce testimony and exhibits obtained by exploitation of the illegal X-ray search of the suitcase and by ruling that he did not have standing to challenge the X-ray search. Robba argues, in part based upon an affidavit which was not admitted in evidence, that he provided Gaias funds to purchase p–2–p in New York, that he was the owner of the p–2–p purchased, that the p–2–p was purchased in the name of Royce International where he was employed and that the lost luggage claim filled out by Gaias set forth his (Robba's) name and residence for purposes of identity and delivery of the suitcase. Robba contends that under these circumstances he had standing to challenge the X-ray search. Robba declares that the X-ray search was illegal and that the illegality thereof was compounded when the Government exploited the X-ray results in order to obtain the search warrant. Under the totality of these circumstances, Robba concludes that the "fruit of the poisonous tree" doctrine as enunciated in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) precluded admission of all "the incriminating evidence which the government developed after they searched Robba's residence and the two vehicles adjacent thereto." We hold that the trial court did not err in finding that Robba lacked standing to challenge the X-ray search or in admitting in evidence the testimony and certain exhibits derived from the search.

■ Robba failed to establish standing to challenge the search. In *United States v. Galvez,* 465 F.2d 681 (10th Cir. 1972), we said:

Our conclusion that the two defendants in the instant case have no standing to contest the legality of the seizure of the package containing hashish from Karen's automobile in Walsenburg is supported by our understanding of such cases as *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); and *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), as well as by numerous cases from this circuit.

In *Jones,* the Supreme Court declared as follows:

"In order to qualify as a 'person aggrieved by an unlawful search and seizure' one must have been a victim of a search or seizure, one against whom the search was directed, as distinguished

from one who claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else. * * *

"Ordinarily, then, it is entirely proper to require of one who seeks to challenge the legality of a search as the basis for suppressing relevant evidence that he allege, and if the allegation be disputed that he establish, that he himself was the victim of an invasion of privacy. * * * "

In *Wong Sun,* it was held that heroin unlawfully taken from another was nonetheless admissible in evidence against Wong Sun because the "seizure of this heroin invaded no right of privacy of person or premises which would entitle Wong Sun to object to its use at his trial." So, here, the seizure of the hashish from Karen invaded no right of privacy of person or premises which would entitle Donald or Veronica Galvez to object to its use at their trial.

And in *Alderman,* the Supreme Court "adhered" to such cases as *Jones* and *Wong Sun,* and to the general rule "that Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."

Cases from this circuit which hold that to be a "person aggrieved" within Fed.R. Crim.P. 41, the person moving to suppress must himself have been the victim of any unlawful invasion of his own privacy, are: *United States v. Humphrey,* 409 F.2d 1055 (10th Cir. 1969); *Cochran v. United States,* 389 F.2d 326 (10th Cir. 1968), cert. denied, 391 U.S. 913, 88 S.Ct. 1808, 20 L.Ed.2d 653 (1968), reh. denied, 393 U.S. 899, 89 S.Ct. 70, 21 L.Ed.2d 187 (1968); *Sumrall v. United States,* 382 F.2d 651 (10th Cir. 1967), cert. denied, 389 U.S. 1055, 88 S.Ct. 806, 19 L.Ed.2d 853 (1968), and *Elbel v. United States,* 364 F.2d 127 (10th Cir. 1966), cert. denied, 385 U.S. 1014, 87 S.Ct. 726, 17 L.Ed.2d 550 (1967), reh. denied, 386 U.S. 939, 87 S.Ct. 959, 17 L.Ed.2d 812 (1967). . . .

465 F.2d, at 684–685.

Inasmuch as the X-ray search was directed at Gaias and not Robba, and since Robba "claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else," he has not attained standing to challenge the X-ray search.

Even assuming, *arguendo,* that Robba did have standing, the reference to the X-ray search in the affidavit executed in support of the search warrant did not vitiate its efficacy nor did it "taint" the validity of the subsequent search and seizure. The affidavit clearly contained adequate factual basis establishing probable cause without reference to or reliance on the X-ray search. The affidavit stated, *inter alia* : Gaias was observed purchasing p–2–p in New York in the name of Royce International and thereafter flying to Denver; odors emanating from the 3352 West Gill Place residence on September 20, 1976, were identical to those which the experienced agents had smelled on numerous prior occasions while investigating the clandestine manufacture of amphetamines; and the agents were aware that Royce International, where Robba and Shovea were employed, had recently received chemicals and equipment normally used in the manufacture of amphetamines.

The adequacy of the affidavit, aside from any reference to the X-ray search, was recognized by the trial court:

If the evidence had been what I understood it to be, that there would not have been any search of the house had it not been for the X-ray at the airport, then I would say you are within the *Wong Sun* rule, but that record is pretty strong that the airport search contributed very, very little to the search at the house. And as I analyze the evidence, beyond any shadow of a doubt, the agency and the government could easily have established probable cause for the search of the house had there been no search at the airport. And indeed, as I look at the search warrant affidavit, the probable cause, I think, is clearly there absent the airport search.

Now, if you want to put on more testimony, you may. But on the basis of the

record made, I do not think that the *Wong Sun* rule includes any evidence of taint at the house in the course of the search there made. I just do not think it goes that far.

And I realize that at this point, I am contradicting, in a sense, what I have said before, and what I have said in a written order to the effect that it was, the airport search was a major part of the reason for the search of the house. I am just plain wrong; it was not. The appellate courts get to read it and think about it; we have to just listen to it.

[R., Vol. I, at 10–11.]

Furthermore, even assuming that Gaias was actually purchasing the p–2–p for Royce International, Robba would nevertheless have no standing as an individual to challenge the search. *See: United States v. Curtis,* 537 F.2d 1091 (10th Cir. 1976), *cert. denied,* 429 U.S. 962, 97 S.Ct. 389, 50 L.Ed.2d 330 (1976), and cases cited therein.

█ In the final analysis, the reference to the X-ray search in the affidavit did not give rise to error, particularly when, as here: the suitcase was simply X-rayed, and not opened; the X-ray established that the suitcase contained four bottles, but it did not in anywise establish the *content* of the bottles; no direct evidence of the X-ray search was offered by the Government; and Gaias' purchase of the p–2–p, his elusive trip to the airport and his subsequent flight to Denver, combined with the strong odors emanating from the residence, generated sufficient independent probable cause for issuance of the warrant.

(b)

Robba contends that the trial court erred in allowing the Government to introduce testimony and exhibits obtained by reason of the exploitation of an illegal surveillance of his vehicle by the use of an electronic tracking device. As noted, *supra,* when Gaias arrived at the airport in Denver, he was met by Robba and the pair then proceeded to Robba's residence in his car. After the parties entered the residence, agents placed an electronic tracking device on Robba's car.

Later the same day, Robba and Gaias were observed leaving the residence in Robba's car. Several agents followed the car. While en route, the agents following the car lost visual contact. Thereafter, by utilizing the tracking device, the agents were able to trace Robba and Gaias to Royce International where they were observed, together with Shovea, loading and unloading boxes from their respective vehicles.

█ The utilization of an electronic tracking device, without prior court approval, may be justified by probable cause and exigent circumstances. The following observations in *United States v. Frazier,* 538 F.2d 1322 (8th Cir. 1976), *cert. denied,* 429 U.S. 1046, 97 S.Ct. 751, 50 L.Ed.2d 759 (1977) are applicable here:

Whether the installation of an electronic tracking device on a motor vehicle is a search or seizure within the protection of the Fourth Amendment is a difficult question. At a minimum, the attachment of such a device, without consent or judicial authorization, is an actual trespass. Although only a limited intrusion, it is one which raises a concern that the government could plant a tracking device on a person's car and follow its movements whenever and wherever it is being driven. *See United States v. Martyniuk, supra* [D.C.], 395 F.Supp. [42] at 44–45. In contrast, it is at least questionable whether a person has a reasonable expectation of privacy with regard to his movements on public roads. *See Cardwell v. Lewis,* 417 U.S. 583, 588–92, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *United States v. Carpenter, supra* [D.C.], 403 F.Supp. [361] at 364–65. *Cf. Katz v. United States,* 389 U.S. 347, 350–59, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In any event, the issue need not be resolved in this appeal since we are convinced the intrusion committed in the instant case, assuming arguendo that it is a search or seizure within the ambit of the Fourth Amendment, was justified by probable cause and exigent circumstances.

The search of a motor vehicle, especially its exterior, is less intrusive and implicates a lesser expectation of privacy than otherwise applies under the general warrant requirement. *See Cardwell v. Lewis,* 417 U.S. 583, 589–91, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974); *Almeida-Sanchez v. United States,* 413 U.S. 266, 279, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (Powell, J., concurring). If there is probable cause, an automobile, because of its mobility, may be searched without a warrant in circumstances that would not justify a warrantless search of a house or office. *Chambers v. Maroney,* 399 U.S. 42, 48–51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States,* 267 U.S. 132, 158–59, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *United States v. Brown,* 535 F.2d 424 (8th Cir. 1976). Probable cause exists when the facts and circumstances within a police officer's knowledge would " 'warrant a man of reasonable caution in the belief that' an offense has been or is being committed." 538 F.2d at p. 1324.

*See also: United States v. Moore,* 562 F.2d 106 (1st Cir. 1977) and *United States v. Hufford,* 539 F.2d 32 (9th Cir. 1976), cert. denied, 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 614 (1976).

■ Applying these standards we hold that the agents had sufficient probable cause to attach the electronic tracking device to Robba's car without first acquiring a court order, and that such an installation herein was not violative of Robba's Fourth Amendment rights.

Prior to attaching the device to Robba's car the agents knew that Gaias had recently purchased p–2–p, a primary precursor of methamphetamine, and that he had made the purchase in the name of Royce International; after purchasing the p–2–p Gaias was observed leaving his residence carrying a suitcase in a flat, careful manner; Gaias was observed driving to a New York airport in an elusive manner and thereafter flying to Denver where he was met by Robba during the early morning hours after which the pair proceeded to Robba's residence.

Furthermore, as in *Frazier, supra,* "[t]hese same facts also suggest the existence of exigent circumstances justifying the limited intrusion (installation of a beeper) conducted in the instant case." Gaias was followed directly from New York to Denver and thence to Robba's residence, arriving in the early morning hours. Surveillance was initiated shortly thereafter at a time when no magistrates were available, and at a time when the agents had no idea if Robba and Gaias would remain in the residence for a few minutes, a few hours, or for a few days.

Although the agents were therefore fully justified in attaching the electronic tracking device to Robba's car, without first securing a court order, we note the device did little more than assist the agents in following Robba and Gaias to Royce International. Once at Royce International, Robba and Gaias were observed, along with Shovea, in loading and unloading boxes into their respective vehicles. This evidence was not dispositive nor crucial and its exclusion would not have affected the outcome reached.

## II.

Shovea contends: (1) the evidence was insufficient to convict; (2) the trial court erred in refusing to strike Agent Barker's testimony; (3) his motion for mistrial should have been granted after the United States Attorney made improper rebuttal argument; (4) the trial court erred in not suppressing the evidence obtained via execution of the search warrant; (5) the jury was improperly instructed relative to possession; and (6) Government witnesses were allowed to testify as experts in an area in which they were not properly qualified.

### (a)

■ Shovea contends that the evidence was insufficient to support the verdicts of guilty returned against him for conspiracy, manufacture and possession with intent to distribute methamphetamine, and aiding and abetting. On appeal from a jury con-

viction, we must view the evidence, both direct and circumstantial, and all reasonable inferences to be drawn therefrom in the light most favorable to the Government in determining its sufficiency. *United States v. Walton,* 552 F.2d 1354 (10th Cir. 1977), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2685, 53 L.Ed.2d 277 (1977); *United States v. Brown,* 540 F.2d 1048 (10th Cir. 1976), *cert. denied,* 429 U.S. 1100, 97 S.Ct. 1122, 51 L.Ed.2d 549 (1977). Applying this standard to the facts in this record, we hold that the evidence is sufficient to sustain the Shovea conviction.

Aside from the fact that Shovea was observed at his place of employment, Royce International, on September 18, 1976, together with Robba and Gaias moving objects between a warehouse and his vehicle which "brief vignette  .  .  .  [Shovea alleges]  .  .  .  connects up in no way with the subsequent facts of the case," Shovea was observed exiting and reentering the residence in question on the evening of the arrest looking about carefully, at a time when methamphetamine was being manufactured in the residence and from which a strong odor of ether emanated. He was thereafter observed shortly prior to his arrest, carrying boxes and a barrel from the house which contained methamphetamine. These facts established sufficient evidence upon which the jury could convict Shovea. *See: United States v. Stricklin,* 534 F.2d 1386 (10th Cir. 1976), *cert. denied,* 429 U.S. 831, 97 S.Ct. 92, 50 L.Ed.2d 95 (1976).

(b)

■ Shovea contends the trial court erred in failing to grant his motion to strike the testimony of DEA Agent Barker following revelation that all of the agent's investigatory notes relative to the events herein had been destroyed. Agent Barker's notes taken during the investigation, were turned over to Agent Moren. Thereafter, Agent Moren incorporated Barker's notes into a report, after which Barker's notes were destroyed pursuant to established policy.

An *in camera* hearing was held on Shovea's motions to dismiss based on the destruction of the notes or in the alternative to strike:

THE COURT: But I'm not aware of any substantial body of law which supports a motion to strike or any other type of motion based upon the destruction of notes in the absence of a showing that the destruction was with malice or evil motive or intent.

I'm not aware of any body of law which says that the motion is good, whereas here the destruction I gather was in accordance with recently established investigative practices in the—within the rules and regulations of this particular agency at that time.

I find absolutely nothing in the evidence to suggest that there was any evil motive in destruction. I find absolutely nothing in the evidence to suggest possible prejudice to the defendant. If you can show me either evil motive or real prejudice to the defendant, that's something else again, but I'm not going to grant your motion in the absence of that.

MR. MARKS: Your Honor, I understand what the criteria are that the Court is setting out. I would submit that I think it would be extremely difficult for any attorney to show prejudice when the document is no longer in existence. And, of course, I don't have any way of advising the Court of what was contained therein.

THE COURT: That's entirely true, but the cross-examination in the area was pretty limited. I think if you'd really thought there was any evil motive or prejudice, knowing your abilities as a cross-examiner, you would have gone a lot farther and a lot harder. I would have.

MR. MARKS: Frankly, I would, too. I don't know of any evil motives and I doubt there were evil motives.

THE COURT: So do I.

[R., Suppl. Vol. II, pp. 322–323.]

In *United States v. Covello,* 410 F.2d 536 (2d Cir. 1969), *cert. denied,* 396 U.S. 879, 90

S.Ct. 150, 24 L.Ed.2d 136 (1969), the Court opined:

> Appellant next claims that the good faith destruction of handwritten interview notes deprived him of his rights at trial under the Jencks Act. At the close of the direct examination of each of the Government's main witnesses defendant requested and received FBI reports regarding FBI interviews with each of the witnesses. Defendant claims, however, that under 18 U.S.C. § 3500 he was also entitled to the original handwritten interview notes of the FBI agents from which the reports were made. At a voir dire examination the agents testified that, pursuant to the practice they customarily follow, they destroyed their notes in good faith after incorporating them into typewritten reports. Under the circumstances, we find no violation of § 3500. The case law amply supports our ruling. Absent an indication that the notes were destroyed for an improper purpose or that the handwritten data was not preserved in the formal reports the reports satisfy the requirements of § 3500. . . (Citations omitted.)

410 F.2d, at p. 545.

*See also: United States v. Lane,* 574 F.2d 1019 (10th Cir. 1978), where this court said in pertinent part:

> We think it would be a judicial invasion into proper law enforcement to *require* the preservation of such notes (DEA agents' investigatory notes) and are convinced that to reverse this case as appellant urges at this late date would thwart justice. *See generally, United States v. Smaldone,* 10 Cir., 484 F.2d 311–18, *cert. denied,* 415 U.S. 915, 94 S.Ct. 1411, 39 L.Ed.2d 469.

P. 1022.

Applying this standard, we hold that the trial court did not err in refusing to strike Agent Barker's testimony.

### (c)

Shovea contends the court erred in refusing to grant his motion for a mistrial made subsequent to rebuttal argument presented by the Government. In closing his argument the Assistant United States Attorney stated:

> And they'd have you believe, well, the reason Mr. Shovea was out at Royce International is because he worked there. Well, I'll concede that he did work there, ladies and gentlemen, but an interesting thing about that, Mr. Shovea—it came out in testimony that he worked there at Royce International. Well, I'm just wondering, perhaps, if he was the one that gave Mr. Gaias the idea to use the fictitious name in New York of Royce International to order the phenyl–2–proponone that was used to make the metamphetamine. It's a possibility. And it's something I would like you to consider in your deliberations.
>
> Thank you for your time and patience. [R., Suppl. Vol. II, pp. 359–360.]

Shovea argues that "no evidence whatsoever was ever introduced which could lead to the supposition or inference that Mr. Shovea gave Mr. Gaias the idea to use the name in New York of Royce International with which to order the phenyl–2–proponone." Shovea did not object to the statement when made but he did move for a mistrial thereafter:

> MR. MARKS: Based upon Mr. Fanning's last comments in his closing statement, his comments as far as his surmise as to what may have happened, were not supported by the evidence.
>
> THE COURT: Had you objected at the time, I would have corrected it, but I'm not going to give you a mistrial.
>
> MR. MARKS: Well, I didn't want to object at that time. I thought that would bring more attention.
>
> THE COURT: You could have corrected it. Do you want time tomorrow. No, I'll deny your motion for mistrial. [R., Suppl. Vol. IV, p. 384.]

In light of the fact that Shovea did not object to the prosecutor's statement when made, we must determine if the statement gave rise to clear error. In *United States v. Stevens,* 452 F.2d 633 (10th Cir. 1972), we observed:

In determining whether the "clear error" rule should be invoked, the entire record must be reviewed and considered. *Adams v. United States,* 375 F.2d 635 (10th Cir. 1967), *cert.* denied, 389 U.S. 880, 88 S.Ct. 117, 19 L.Ed.2d 173 (1967); *Jennings v. United States,* 364 F.2d 513 (10th Cir. 1966), *cert. denied,* 385 U.S. 1030, 87 S.Ct. 760, 17 L.Ed.2d 677 (1967). And in weighing whether there was a clear error the most significant factor to be considered is the strength of the case against the defendant. *United States v. Williams,* 445 F.2d 421 (10th Cir. 1971). The evidence against Stevens is substantial; the testimony concerning other stolen vehicles could not have had a significant effect in influencing the jury verdict. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

452 F.2d, at p. 635.

We hold that the prosecutor's comment did not give rise to clear error. Shovea's participation in the conspiracy was substantial. Error, if present, was harmless. In *United States v. Guerrero,* 517 F.2d 528 (10th Cir. 1975), we stated:

We recently noted in *Young v. Anderson,* 513 F.2d 969 (10th Cir. 1975), citing to *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974):

. . . not every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a "failure to observe that fundamental fairness essential to the every concept of justice." *Lisenba v. California,* 314 U.S. 219, 236 [62 S.Ct. 280, 290, 86 L.Ed. 166] (1941).

416 U.S. 637, at 642, 94 S.Ct. 1868, at 1871, 40 L.Ed.2d 431.

517 F.2d, at p. 531.

*See also: United States v. Hall,* 536 F.2d 313 (10th Cir. 1976), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976); *Sanchez v. Heggie,* 531 F.2d 964 (10th Cir. 1976); *cert. denied,* 429 U.S. 849, 97 S.Ct. 135, 50 L.Ed.2d 122 (1976).

Shovea's trial attorney was aware that the comment was made. He opted, as a matter of trial tactic, not to move the court for corrective action at that time. Under these circumstances and in view of the relative harmless nature of the comment, the trial court properly refused to grant Shovea's motion for mistrial.

## (d), (e) and (f)

Shovea's remaining allegations of error do not merit further detailed discussion. The evidence obtained by the search following execution of the search warrant was proper, as discussed under *Robba, supra;* the trial court's instructions relating to possession were proper; and the Government's experts were properly qualified.

## III.

Gaias' sole allegation of error is that the trial court erred in allowing in evidence that which the Government obtained by search and seizure at 3352 West Gill Place following the execution of the search warrant, since "that search warrant was substantially based upon a previous unconstitutional search of . . . [his] . . . suitcase." This contention is without merit. *See* Robba (a), *supra.*

## WE AFFIRM.