**UNITED STATES of America, Appellee,**

v.

**Dale David BRUNEAU, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Jeffrey Charles KOHNER, Appellant.**

**Nos. 78–1526, 78–1550.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 13, 1978.

Decided March 1, 1979.

Rehearing and Rehearing En Banc Denied March 21 and 27, 1979.

Andre J. Zdrazil, St. Paul, Minn., for appellant Bruneau.

Joseph S. Friedberg, Minneapolis, Minn., for appellant Kohner.

Richard E. Vosepka, Jr., Asst. U. S. Atty., Minneapolis, Minn., for appellee; Andrew W. Danielson, U. S. Atty., Minneapolis, Minn., on the brief; Jennifer Wellner, Legal Intern, on the brief in No. 78–1526.

Before STEPHENSON, HENLEY and McMILLIAN, Circuit Judges.

McMILLIAN, Circuit Judge.

Appellants, Dale David Bruneau and Jeffrey Charles Kohner, appeal from their convictions of conspiracy to import marijuana into the United States in violation of 21 U.S.C. §§ 952(a) and 963. Appellant Bruneau also appeals his conviction of import-

ing marijuana in violation of 21 U.S.C. § 952(a).[1]

For reversal Bruneau argues that the trial court erred: (1) in denying him standing to challenge the warrantless search of the Commander airplane; (2) in denying his motion to suppress the evidence secured by the transponder placed on the Commander airplane; and (3) in denying his motion to disclose the identity of the informants who testified as government witnesses at trial. Appellant Kohner argues that there was insufficient evidence to support the jury's conclusion that he was a member of the conspiracy to import marijuana. We find no basis for any of these allegations of error and affirm the judgments of conviction entered by the district court.[2]

Between May 1975, and May 1976, William Lloyd David Cooper masterminded an extensive scheme to import large quantities of marijuana from Mexico into the United States. Single and twin engine airplanes, which could carry up to one ton of marijuana, were used for the smuggling. Cooper hired numerous individuals as pilots and arranged for the airplanes, loaded with marijuana cargo, to land in various locations including Phoenix, Arizona; El Paso, Texas; Sandstone, Minnesota; and Alaska.

On February 17, 1976, an Aero Commander airplane, allegedly flown by Bruneau, was found at the Sandstone, Minnesota, airport with marijuana debris scattered in and around it. Federal complaints and arrest warrants were issued that day and on May 17, 1976, a twenty-eight count indictment was returned against fifteen defendants, including Cooper, Bruneau and Kohner. Cooper pled guilty to three counts of the indictment including conspiracy to import marijuana. Prior to sentencing, however, Cooper became a fugitive and remains so to date. The joint trial of Kohner, Bruneau and three other defendants commenced on April 10, 1978. All were convicted of conspiring to import marijuana (and in Bruneau's case, of importing marijuana). Only Kohner and Bruneau appeal their convictions.

## DALE DAVID BRUNEAU

Appellant Bruneau's first allegation of error is that the trial court improperly denied him standing to challenge the February 17, 1976, warrantless search of the Commander by Federal Drug Enforcement Administration (DEA) agents. As stated, on February 17, DEA agents found the Commander at the Sandstone Airport with warm engines and with marijuana debris scattered about. This evidence was used to support the importing marijuana count against Bruneau.

In order to maintain a motion to suppress evidence on the ground that the evidence was seized in an illegal search, a defendant must have a recognizable interest in the premises searched. The Supreme Court has identified these interests as: (1) being "on the premises at the time of the contested search and seizure," (2) having a "proprietary or possessory interest in the premises," and (3) being "charged with an offense that includes, as an essential element of the offense charged, possession of the seized evidence at the time of the contested search and seizure." *Brown v. United States,* 411 U.S. 223, 229, 93 S.Ct. 1565, 1569, 36 L.Ed.2d 208 (1973); *Simmons v. United States,* 390 U.S. 377, 390, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Jones v. United States,* 362 U.S. 257, 261, 80 S.Ct. 725, 4 L.Ed.2d 697 (1959). Bruneau attempts to bring himself within these guidelines by alleging that he has a possessory interest in the Aero Commander.

We find his argument incredulous. According to appellant Bruneau, he gave Bill Cooper $10,000 to purchase an airplane for him, and Cooper purportedly used this money to help purchase the Commander. Although Bruneau was able to document

---

1. Kohner was sentenced to four years in prison and three years special parole thereafter. Bruneau was sentenced to four years in prison and three years special parole thereafter on each count, the sentences to run concurrently.

2. The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota.

**1193**

that he obtained a $10,000 loan from his bank, he could not show who this money went to or for what. Bruneau's alleged interest in the airplane is not shown on any of the ownership papers for the airplane. Because any reasonable person doing legitimate business would insist upon at least this indicia of his investment, we cannot believe Bruneau's assertion of ownership. Therefore, we affirm the trial court's finding that Bruneau does not have standing to challenge the search of the Commander.[3]

Appellant Bruneau's second allegation of error is that the trial court improperly denied his motion to suppress the evidence secured by the transponder which was placed in the Aero Commander airplane used by Cooper and his pilots.

On February 4, 1976, a Special Agent of the DEA submitted an Affidavit and Statement of Probable Cause to the United States Magistrate in Phoenix.[4] The DEA requested and secured an order authorizing placement of a transponder in the Commander on the ground that the Commander was being used to facilitate crimes against the United States. The DEA agents installed the transponder with the permission of its present owner-seller before Cooper

paid the balance of the purchase price or took possession of the plane. Using the transponder, the agents were able to track the Commander as it made trips from Minnesota to the United States-Mexican border and into Mexico, during the period of February 12–17, 1976.

Appellant Bruneau challenges the above statement of probable cause on the ground that the informants supplying information about Cooper's activities were not reliable and on the ground there was no evidence that the Commander was being used for illegal activities. The question underlying this challenge is whether installation and use of a transponder to trace an airplane is a search within the fourth amendment. If it is not a search, there is no requirement of a court order supported by probable cause. Because we hold that tracking an airplane with a transponder is not a search within the fourth amendment, we do not address the alleged problems appellant Bruneau raises in the statement of probable cause.

A transponder is an electronic tracking device commonly known as a "beeper." It is "a small radio transmitter that broadcasts only a signal; it does not record any sounds or transmit conversations.[5] The

---

**3.** Less than one month after appellant submitted his case to this Court, the Supreme Court in *Rakas v. Illinois,* —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), reassessed its analysis of fourth amendment standing questions in *Jones v. United States, supra,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1959). Not having the benefit of the Supreme Court's new theoretical approach to standing when he argued his case to this court, appellant based his argument on the *Jones* analytical framework. We do not believe, however, that the *Rakas* approach changes our inquiry or the result in the case at bar.

The Court in *Rakas* determined that to separate the question of standing to challenge a search and seizure from the substantive fourth amendment analysis of the search itself is artificial because the question crucial to both is that posed in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), of "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois, supra,* 99 S.Ct. at 428, 430. Using this analysis to determine appellant Bruneau's standing to challenge the February 17 search,

we reach the same conclusion as with our analysis under *Jones:* appellant has no standing. Appellant has attempted to allege an interest in the airplane (i. e. he is part owner) which would give him a legitimate expectation of privacy in the airplane's contents, but as we noted above, his assertion of ownership is not credible. Beyond his assertion of part ownership, appellant has alleged no other connection with the airplane from which we can conclude that he has an expectation of privacy which is entitled to fourth amendment protection.

**4.** United States Magistrate Richard C. Gormley.

**5.** "Because these devices are incapable of transmitting speech, they do not intercept communications and are not regulated by Title III, the federal wiretap statute." Carr, "Electronic Beeper," 4 *Search & Seizure L.Rep.,* No. 4 (April 1977).

The technique of tracking with beepers is apparently difficult to operationalize. Especially in urban areas, it is problematical to intercept only the electromagnetic waves emitting from the beeper. Dowling, " 'Bumper and Beepers' and the Fourth Amendment," 13

signal that the beeper emits can be monitored by directional finders, thereby enabling officers to determine the beeper's location." Carr, "Electronic Beepers", 4 *Search & Seizure L.Rep.,* No. 4 (April 1977).

In addressing the issue of whether use of a transponder constituted a search, we adopt the Ninth Circuit's "bifurcated analytical framework" which examines the fourth amendment implications of the installation or attachment of the beeper separately from the fourth amendment implications of monitoring its signals. *United States v. Miroyan,* 577 F.2d 489, 492 (9th Cir. 1978); *see also* Note, "Electronic Tracking Devices & Privacy: See No Evil, Hear No Evil, But Beware of Trojan Horses," 9 *Loy.Chi.L.J.* 227, 236 (1977).

■ We agree with the Ninth Circuit that the installation or attachment of a beeper could potentially violate the fourth amendment. No fourth amendment rights were violated by the installation in the present case, however, because "[t]he record clearly establishes that the transponder was installed with the express consent of the aircraft's owner while the airplane was within his complete dominion." *United States v. Miroyan, supra,* 577 F.2d at 493. On February 4, 1976, DEA Agents installed the transponder with its present owner's permission. On February 5, 1976, Cooper assumed ownership.

The next question, however, whether monitoring the location of an airplane by *use* of a transponder is a search within the fourth amendment, is more difficult. Numerous courts have addressed this issue in various contexts, such as placement of a transponder on automobiles, on aircraft, and in packages sold or given to defendants.[6]

The Ninth Circuit stands alone in holding that use of a beeper to follow an automobile or an airplane is not a search within the fourth amendment. *United States v. Miroyan, supra,* 577 F.2d at 492 (airplane); *United States v. Curtis,* 562 F.2d 1153, 1156 (9th Cir. 1977) (airplane); *United States v. Pretzinger,* 542 F.2d 517, 520 (9th Cir. 1976) (airplane); *United States v. Hufford,* 539 F.2d 32, 34 (9th Cir.), *cert. denied* 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 614 (1976) (automobile). Thus far, the only courts to explicitly rule to the contrary in published opinions are two district courts and these decisions have been discredited somewhat on appeal. *United States v. Bobisink,* 415 F.Supp. 1334, 1337 (D.Mass.), *aff'd sub nom. United States v. Moore,* 562 F.2d 106 (1st Cir. 1976); *United States v. Martyniuk,* 395 F.Supp. 42, 44 (D.Or.1975), *aff'd in part and rev'd in part sub nom. United States v. Hufford, supra,* 539 F.2d 32. This court in *United States v. Frazier,* 538 F.2d 1322, 1324 (8th Cir. 1976),[7] and the Fifth Circuit

*Crim.L.Bull.* 266, 269 (July-Aug. 1977). And, unless antennas are properly equipped, "a 180 degree ambiguity will result from reception of the signals from the subject's automobile. The practical effect . . . is that once the subject makes a turn, it may be difficult to ascertain whether it was to the right or to the left." *Id.* at 267, n.3. *E.g., United States v. Crowell,* 586 F.2d 1020, 1027 (4th Cir. 1978); *United States v. Bobisink,* 415 F.Supp. 1334, 1336 (D.Mass.1976).

6. Courts have also addressed a related issue: whether placement of a beeper in contraband is a search within the fourth amendment. These courts have consistently held that use of ,a beeper in such circumstances is not a search on the ground that no one has a "legitimate expectation of privacy in substances which they have no right to possess at all." *United States v. Moore,* 562 F.2d 106, 111 (1st Cir. 1976); *see, e. g., United States v. Botero,* 589 F.2d 430 (9th Cir. 1978); *United States v. Pringle,* 576 F.2d

1114, 1119 (5th Cir. 1978) (beeper placed in package of heroin); *United States v. Emery,* 541 F.2d 887, 890 (1st Cir. 1976) (beeper placed in packages of cocaine); *United States v. Perez,* 526 F.2d 859, 863 (5th Cir.), *cert. denied,* 429 U.S. 846, 97 S.Ct. 129, 50 L.Ed.2d 118 (1976) (beeper placed in television which was bartered in a heroin trade); *United States v. French,* 414 F.Supp. 800, 803, 804 (W.D.Okl. 1976) (beeper placed in marijuana); *United States v. Carpenter,* 403 F.Supp. 361, 365 (D.Mass.1975) (beeper placed in packages of cocaine). These cases are inapplicable to the case at hand because here the beeper was not placed in contraband.

7. In *Frazier,* this court (as did the Fifth Circuit two years later in *Cheshire* ) found that it was not necessary to determine if use of a beeper constituted a search because, assuming arguendo it was a search, placement of the beeper was justified by exigent circumstances and

in *United States v. Cheshire,* 569 F.2d 887, 888 (5th Cir. 1978),[8] have avoided the issue by resolving the cases presenting this question on other grounds.

Although it did not explicitly say so, the First Circuit apparently holds that, at least when the transponder is used on an automobile, the "automobile exception" to the warrant requirement applies. *United States v. Moore, supra,* 562 F.2d at 112–113. Beginning with *Carroll v. United States,* 267 U.S. 132, 153, 45 S.Ct. 280, 69 L.Ed. 543 (1925), the courts have recognized an "automobile exception" to the warrant requirement, in which probable cause alone (without also showing exigent circumstances) was sufficient to justify the search of an automobile. This exception came about for two reasons: (1) because of an automobile's mobility, and the difficulty officers experienced in readily obtaining a warrant, exigent circumstances were presumed, and (2) there is assumed to be a lesser expectation of privacy in one's automobile as compared to one's home. *United States v. Chadwick,* 433 U.S. 1, 12–13, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1976). Citing cases which discuss the automobile exception, the First Circuit in *Moore* held that a warrant was not required to monitor the location of an automobile as long as the

officers had probable cause to believe defendants were about to engage in illegal activity.[9]

The Tenth Circuit, in *United States v. Shovea,* 580 F.2d 1382, 1387–88 (10th Cir. 1978), *petition for cert. denied* —— U.S. ——, 99 S.Ct. 1216, 59 L.Ed.2d 456 (1979), adopted the approach in *United States v. Frazier, supra,* and found it unnecessary to decide whether the use of a transponder was a search.[10] One month later, in *United States v. Clayborne,* 584 F.2d 346, 351 (10th Cir. 1978), the Tenth Circuit apparently held that some but not all of the fourth amendment protections applied to transponder situations. It held that the warrantless use of a beeper placed inside chemical drums to discover defendants' clandestine laboratory did not violate the fourth amendment because the officers had probable cause to believe illegal activity was taking place. Although it does not involve an automobile and thus cannot come within the automobile exception, *Clayborne* seems to be in accordance with the First Circuit's view that a transponder can be used on a showing of probable cause alone. *Compare United States v. Clayborne, supra,* 584 F.2d at 350 *with United States v. Moore, supra,* 562 F.2d at 112–113.[11]

---

probable cause. *United States v. Frazier, supra,* 538 F.2d at 1324; *United States v. Cheshire, supra,* 569 F.2d at 888.

**8.** In 1973, nine individuals were indicted on drug charges. The United States District Court for the Northern District of Florida granted ·their motion to suppress evidence seized with the aid of an electronic beeper on the ground that use of the beeper was a search, and, because the officers had not obtained a warrant to use the beeper, the search was illegal.

A three judge panel for the Fifth Circuit Court of Appeals affirmed the decision, *United States v. Holmes,* 521 F.2d 859 (5th Cir. 1976), but its judgment was vacated when rehearing en banc was granted on January 5, 1976. *United States v. Holmes,* 525 F.2d 1364 (5th Cir.). The Fifth Circuit en banc split 8–8 on the issue of whether use of a beeper was a search and therefore affirmed the district court decision. *United States v. Holmes,* 537 F.2d 227, 227 (5th Cir. 1976). On March 16, 1978, the Fifth Circuit made it clear that it had not ruled on this issue and expressly declined to do so in the case before it because probable cause and

exigent circumstances were present. *United States v. Cheshire, supra,* 569 F.2d at 888.

**9.** Electronic beepers were used in two instances in *Moore;* one was attached to defendants' automobile, the other was placed in a box of chemicals purchased by defendants. Only the court's holding as to the automobile is relevant to our case but it is worth noting that the First Circuit held that a warrant was necessary for the beeper placed in the box of chemicals because the presence of the box (and thus of the beeper) in a private residence infringed fourth amendment rights. *United States v. Moore, supra,* 562 F.2d at 113–114.

**10.** The court found that probable cause and exigent circumstances existed. *United States v. Shovea, supra,* 580 F.2d at 1388.

**11.** Assuming we are interpreting the Tenth Circuit cases correctly, we feel compelled to highlight what we perceive as problems in the Tenth Circuit's approach, and thus the reasons why we cannot join in its position.

First we are unclear if the court ever addressed what we regard as the crucial underly-

The policy arguments supporting both the view that use of a transponder is a search and that it is not, are persuasive. The major thrust of the argument that use of a beeper is not a search is that the transponder merely facilitates manual, visual surveillance, which is clearly not a search within the fourth amendment. *United States v. Clayborne, supra,* 584 F.2d at 351; *United States v. Frazier, supra,* 538 F.2d at 1326 (Ross, J., concurring); *United States v. Hufford, supra,* 539 F.2d at 34; 9 *Loy.Chi. L.J., supra,* at 242–243. The counterargument is that the beeper does more than facilitate visual observation: it denies one the opportunity to perceive and perhaps lose his follower; it allows for continual observation over long periods of time; it continues to monitor location when the device enters private property (an area which is off-limits to law enforcement personnel); and it creates the likely possibility that law enforcement personnel will be privy to information exceeding that necessary to trace the crime at hand. *See* 4 *Search & Seizure L.Rep., supra,* No. 4 at 3 (April 1977); Note, "Tracking *Katz*: Beepers, Privacy, and the Fourth Amendment," 86 *Yale L.J.* 1461, 1493–96 (1977); *cf. United States v.*

*Holmes, supra,* 521 F.2d at 866, *vacated by rehearing en banc,* 537 F.2d at 227.

The apparent struggle in the above cases to reach an acceptable approach to the use of beepers indicates the complexity of this issue. At the root of the debate is the philosophical question of whether our sense of privacy, and the protection afforded it by the Constitution, does and should adjust to technological advances.

■ With due respect for the complexity of this issue we limit our decision to the precise issue before us: whether the use of a transponder to track aircraft in public airspace constitutes a search within the fourth amendment.

The beginning point of our analysis is *United States v. Katz,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), wherein the Supreme Court held that the use of an electronic device attached to the exterior of a public pay telephone booth to listen to the defendant's conversation within, was a search within the fourth amendment. For our purposes, the crucial aspect of *Katz* is the test it sets forth for determining what is and is not a search within the fourth amendment.[12] As stated by Justice Harlan in his concurring opinion, "there is a two-

---

ing question of whether use of a beeper is a search within the fourth amendment. Like this court in *Frazier,* the Tenth Circuit avoided this question in *Shovea,* and it certainly never explicitly addressed the question in *Clayborne.* In *Clayborne* the court concluded that there is no "per se . . . violation of the Fourth Amendment." *United States v. Clayborne, supra,* 584 F.2d at 351. It is not clear, however, whether the court reached this position because it found there was no justifiable expectation of privacy in the laboratory's location and thus, use of the transponder to locate it is not a search, *id.;* or if the court found no violation because, although it assumed that use of a beeper was a search, the court found sufficient fourth amendment requirements were met, *id.* at 350. We note in passing that an argument could be made that, like the contraband cases, *see* note 4 *supra,* there is no expectation of privacy in a clandestine laboratory in which illegal drugs are manufactured.

On the other hand, if the Tenth Circuit is holding that use of a transponder is a search but can be justified merely by showing probable cause, we question the wisdom of such a position.

Generally, to prove an exception to the warrant requirement one must show probable cause and exigent circumstances (so that it becomes impractical to obtain a warrant). The automobile exception, as discussed above, relaxes this exception by demanding only a showing of probable cause to bypass the warrant requirement. There are, however, well defined reasons for the automobile exception (mobility of the automobile and lesser expectation of privacy), which do not apply to a non-automobile situation, such as the clandestine laboratory in *Clayborne.* The Tenth Circuit, in requiring only a showing of probable cause, never discussed why this lesser requirement was justified in a non-automobile situation.

12. Some judges have thought it significant in applying *Katz* to transponder cases that *Katz* involved interception of conversations, while a transponder merely involves interception of location. *E. g., United States v. Frazier, supra,* 538 F.2d 1322 (Ross, J., concurring). While this distinction may become crucial when courts evaluate an individual's expectation of privacy, it does not render inapplicable the test *Katz* provides for determining what is and is not a search.

fold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable'." *Id.* at 361, 88 S.Ct. at 516. "Supreme Court decisions since *Katz* have generally used this 'privacy' formulation to determine issues of the fourth amendment's scope . . . ." Amsterdam, "Perspectives on the Fourth Amendment," 58 *Minn. L.Rev.* 349, 358 (1974) (and cases cited therein)[13]; *see, e. g. Rakas v. Illinois*, 99 S.Ct. at 428 (1978). Applying the *Katz* test, our inquiry becomes: what is one's reasonable, subjective expectation of privacy in the airborne location of an airplane? There can be but one answer: none. Today as our airways become more congested, it is imperative that the location of all airborne planes, of every size and type, be carefully monitored. It is risking collision for an aircraft to surreptitiously venture forth into unassigned air space. For this reason, we do not believe anyone flying an airplane today can reasonably expect that he has a right to keep his flying, landing, or take off location private. Therefore, we hold that monitoring the airborne location of an aircraft with a transponder is not a search within the fourth amendment.

On the basis of the foregoing discussion, it is apparent that appellant has no fourth amendment rights which were violated by an allegedly insufficient statement of probable cause.[14]

Appellant Bruneau's third allegation of error is that the trial court improperly denied his pretrial motion to compel disclosure of the identity of informants "A" and "B".

These informants testified at trial as part of the government's case in chief and appellant argues that disclosure of their identity would have been helpful to him as he was preparing his case.

When a government informant is an active participant in, or witness to, the offense charged, his identity must generally be disclosed upon a defendant's motion. When, however, the government informant is a mere tipster who conveys information to the government but neither witnesses nor participates in the offense, disclosure cannot be mandated. *Roviaro v. United States*, 353 U.S. 53, 60–61, 64, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); *United States v. Barnes*, 486 F.2d 776, 778–779 (8th Cir. 1973).

■ It is not necessary that we decide into which category of informant "A" and "B" fit because even if we found that the government had a duty to disclose their identity to defendant prior to trial, there is no material prejudice from the government's alleged failure to do so. It is apparent from the record that appellant Bruneau knew before trial that Peter London and William Miller were "A" and "B". *See, e. g., United States v. Woods*, 486 F.2d 172, 174 (8th Cir. 1973); *United States v. Roelle*, 487 F.2d 395, 398–99 (8th Cir. 1973).

Over one year before trial, in a Motion to Suppress, appellant Bruneau himself identified William Miller as a government informant and, detailing Miller's code name in the government transcripts, gave the date and location of four conversations between himself and Miller.[15] Three days before

13. Although Professor Amsterdam acknowledges that this has been the test used by the Court as a whole since *Katz*, he challenges whether this test is consistent with the majority opinion in *Katz* and whether as a test it best encompasses the protections of the fourth amendment. 58 *Minn.L.Rev., supra*, at 358.

14. We also note that appellant claims that installation of the transponder violated FAA regulations requiring that only certified persons perform maintenance or make alterations on aircraft. According to appellant, installation of the transponder constituted an "alteration" within these regulations, and was unlawful be-

cause the DEA agents were not persons certified within the FAA guidelines. Even a cursory survey of the extensiveness of the "alterations" contemplated in the FAA regulations reveals the frivolity of appellant's contention that installation of a transponder is within the guidelines. "Maintenance, Preventive Maintenance, Rebuilding & Alteration", 14 C.F.R. Part 43 (1971), Appendix A. We therefore reject all aspects of appellant's second allegation of error.

15. This information was disclosed in a memorandum in support of Bruneau's Motion to Suppress submitted to the trial court on March 14, 1977. Trial began on April 10, 1978.

trial, an extensive interchange occurred in open court between the defense attorneys and the Assistant United States Attorney as to whether the eight-hour tape of Peter London's interview with federal agents should be transcribed for the attorneys before trial commenced. It is apparent from this discussion that all attorneys and the court knew that Peter London was an informant, that he would be called by the government to testify, and that his testimony would be damaging. Both William Miller and Peter London testified at trial as government witnesses and counsel for the government openly questioned them about their cooperation with the government. All five defense attorneys cross-examined Miller and London and, focusing on their cooperation with the government, attempted to impeach them because of special treatment they may have received from the government for testifying.

In light of all of the above, appellant Bruneau is considerably less than candid with this court in asserting that he did not know at trial and does not presently know the identity of "A" and "B". In conclusion, because appellant Bruneau suffered no prejudice from the denial of his motion to disclose, we reject his claim of error.

For the foregoing reasons, we affirm appellant Bruneau's conviction on both counts.

## JEFFREY CHARLES KOHNER

Appellant Kohner's sole contention on appeal is that there was insufficient evidence to submit the case against him to the jury. In considering this question, the district court was bound by the rule that

> "[i]f the evidence is such that a reasonable person *may* have a reasonable doubt as to the defendant's guilt, the case should be submitted to the jury. On the other hand, a trial judge should not permit a case to go to the jury if the evidence is so scant as to allow the jury merely to speculate or to conjecture as to the defendant's guilt."

*United States v. Frol,* 518 F.2d 1134, 1137 (8th Cir. 1975), *citing United States v. Stephenson,* 474 F.2d 1353, 1355 (5th Cir. 1973). Applying these principles, we find that the case against Kohner was properly submitted to the jury.

In affirming the trial court we acknowledge the dangers of the conspiracy charge, especially in light of the "growing habit to indict for conspiracy in lieu of prosecuting for the substantive offense itself . . ." *Krulewitch v. United States,* 336 U.S. 440, 445, 69 S.Ct. 716, 719, 93 L.Ed. 790 (1949) (Jackson, J., concurring). Nevertheless, we believe the trial court has been extremely solicitous of appellant Kohner's right to a fair trial and the government has met its burden in its case against Kohner. Thus, we do not believe appellant has been subjected to the dangers inherent in a conspiracy charge.

We note initially that "[i]n reviewing a jury finding of guilt in a criminal case, an appellate court is required to view the evidence in the light most favorable to the government and to accept as established all reasonable inferences to support the conviction." *United States v. Brown,* 584 F.2d 252, 262 (8th Cir. 1978), *petition for certiorari filed,* No. 78–833 (Nov. 11, 1978); *United States v. Scholle,* 553 F.2d 1109, 1118 (8th Cir. 1977). Furthermore, "[o]nce the existence of a conspiracy is established, even slight evidence connecting a defendant to the conspiracy may be sufficient proof of his involvement in the scheme." *United States v. Schmaltz,* 562 F.2d 558, 560 (8th Cir.) *cert. denied* 434 U.S. 957, 98 S.Ct. 485, 54 L.Ed.2d 315 (1977); *United States v. Wyant,* 576 F.2d 1312, 1316 (8th Cir. 1978); *United States v. Overshon,* 494 F.2d 894, 896 (8th Cir.), *cert. denied* 419 U.S. 853, 95 S.Ct. 96, 42 L.Ed.2d 85 (1974).

To prove that a defendant is part of a conspiracy it is necessary to show that he "knowingly contributed . . . efforts in furtherance of it." *United States v. Brown, supra,* 584 F.2d at 262; *United States v. Fuel,* 583 F.2d 978, 981 (8th Cir. 1978); *United States v. Anthony,* 565 F.2d

533, 539 (8th Cir. 1977), *cert. denied*, 434 U.S. 1079, 98 S.Ct. 1274, 55 L.Ed.2d 787 (1978). There was sufficient evidence that Kohner contributed efforts to the furtherance of this conspiracy.

The government has introduced considerable evidence, some of which we find less than persuasive, in its attempt to link Kohner to the conspiracy. Counsel for the government proved that Cooper placed telephone calls to Kohner at times crucial to the smuggling endeavors such as before and after successful smuggling ventures, and immediately after one of Cooper's pilots had crashed in Mexico with an airplane apparently loaded with marijuana. Moreover, these calls followed a suspicious pattern: they were interspersed, in a very short time period, with calls to other members of the conspiracy. Appellant Kohner, however, has pointed to flaws in this evidence: Cooper, not Kohner, initiated the telephone calls; the substance of these conversations was never disclosed, and Kohner was only one of many people Cooper communicated with telephonically—the calls highlighted by the government comprised only 10% of all of Cooper's telephone calls.

The government also introduced Cooper's telephone book which, in addition to the other defendants' telephone numbers, included Kohner's number with the initials JK. A listing in Cooper's telephone book is scarcely exclusive, however. As the defense pointed out, there were an additional seventy-five names in Cooper's book.

Lastly, the government introduced evidence that an automobile fitting the description of one used by Kohner and driven by an individual also allegedly fitting Kohner's description was seen by a local resident heading toward the Sandstone, Minnesota, airport at 6:00 a. m., on the morning the Commander landed with a shipment of marijuana. On this date, however, the car no longer belonged to Kohner and the local resident who was a witness at trial never made, and was never asked to make, an in-court identification of Kohner.

In summary we find that all of the above evidence introduced by the government is sufficiently impeached by the defense to render it equivocal in proving Kohner's participation in the conspiracy. Thus, while it raises suspicions about Kohner's association with Cooper we do not rely on it alone to affirm the jury's conclusion. Instead, we rely on the conversation Kohner and Cooper engaged in with Bruce Preece, a Minnesota undercover narcotics investigator, on February 4, 1976. Unlike the above evidence, this survives under scrutiny and supports the jury's findings.

In this conversation, Kohner attempted to recruit Preece as a pilot for smuggling marijuana. Although there was evidence at trial that Cooper also used pilots in legitimate business endeavors, Kohner ruled out the possibility, to our minds, that Preece was being recruited for legitimate purposes. Kohner told Preece that he [Preece] could "fly year round for us, if you don't mind what you haul," and that "[t]he last guy who worked us said he was capable but he ended up digging a deep furrow." Because one of the pilots who smuggled marijuana for Cooper was killed in an airplane crash several days before this conversation, the jury could reasonably conclude that this last reference was to this pilot and thus, Kohner was discussing smuggling activities. Cooper's statement to Preece that he would have to fly at an altitude of 17 feet with 300 feet visibility lends further credence to the view that Kohner and Cooper were recruiting Preece for illegal expeditions.

The defense sought to minimize the impact of this conversation by attempting to impeach Preece's memory and by presenting evidence that Kohner was intoxicated, but this merely raises questions of credibility which were resolved by the jury against Kohner and to which we defer. *Cf. Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 1222 (1942); *United States v. Lanier*, 578 F.2d 1246, 1251 (8th Cir. 1978). The defense also highlighted the fact that at times in the conversation, Kohner told Preece he could fly for *us* and other times told Preece he could fly for *him* (meaning Cooper alone and thus, according to the defense, not including himself in the con-

spiracy). We do not find these references to Cooper alone significant; they do not exclude Kohner's participation in the conspiracy as the defense argues, but as is more likely, point to the fact that Kohner deferred to Cooper on management decisions.

For the foregoing reasons, we find there was sufficient evidence of Kohner's participation in the conspiracy to submit the case to the jury.

The judgment of the district court is affirmed.