UNITED STATES of America,
Plaintiff-Appellee,

v.

Fabio ALONSO, Defendant-Appellant.

No. 84–1082.

United States Court of Appeals,
Tenth Circuit.

May 16, 1986.

Wayne T. Dance, Asst. U.S. Atty., Brent D. Ward, U.S. Atty., Salt Lake City, Utah, for plaintiff-appellee.

Daniel T. Goodwin of Dailey, Goodwin & O'Leary, Denver, Colo., for defendant-appellant.

Before BARRETT, SEYMOUR, Circuit Judges and KANE, District Judge.*

KANE, District Judge.

Fabio Alonso was convicted by a jury of possession of a controlled substance under 21 U.S.C. § 841(a)(1), and importation of a controlled substance in violation of 21 U.S.C. § 952(a). On appeal, Alonso raises

---

* Honorable John L. Kane, Jr., United States District Judge for the District of Colorado, sitting by designation.

four grounds for reversal or remand: (1) insufficiency of the evidence; (2) the trial court's denial of a motion to suppress evidence derived from an electronic beeper device; (3) the trial court's denial of a motion to suppress evidence gained from a warrantless arrest; and (4) the trial court's refusal to issue Alonso's tendered "mere presence" jury instruction. For the reasons set forth below, Alonso's conviction is affirmed.

## I. BACKGROUND

Pursuant to a valid court order issued by the United States District Court for the Western District of Texas on June 12, 1983, a transponder was hidden in a DC–7 aircraft, Federal Aviation Administration # N8852, on about June 13, 1982. By its own terms, this order expired 60 days from the date of its issue. A transponder is an electronic device which upon receiving a designated signal emits a signal of its own.

On September 17, 1983, by means of the transponder, federal authorities detected the DC–7 entering United States airspace from Mexico. The plane was tracked to an abandoned desert airstrip at McKay Flats, Emery County, Utah. Local authorities were alerted. Around 3:00 a.m. on September 17, Emery County Deputy Sheriff Brent Pace and Utah Highway Patrol Trooper Steve Rappage were dispatched to investigate the plane that had just landed. At trial Pace testified that McKay Flats is located in southern Utah. One seeking habitation near McKay Flats must travel 30 miles to the east, 75 miles to the west, 50 miles to the north and 50 miles to the south. It is not an area frequented by joggers or casual visitors.

As they drove toward the airstrip on the dirt Ranch Exit Road off of Interstate 70, Pace and Rappage saw a set of automobile headlights coming toward them. The vehicle, a Jeep Cherokee, stopped and its occupants were observed to flee. A short time later a semi-truck and a semi-truck trailer were spotted coming down the road. The truck stopped and the officers saw a figure in its cabin. Upon investigation of the Jeep, truck and trailer, Pace and Rappage found footprints and configurations in the dirt which indicated the suspects had been running and fell down. The trailer contained about 20,000 pounds of marijuana.

With the marijuana in custody, the police set about capturing the fleeing suspects. Pace testified that the police focused patrols on the routes the suspects would most likely use as a means of escape from this desolate area. Interstate 70 from Ghost Rocks, (ten miles to the west of Ranch Exit), to the brake test area, (seven miles to the east of Ranch Exit), was chosen as the target patrol area. During the times pertinent to this appeal, this stretch of I–70 was patrolled continually by at least two posse groups in unmarked vehicles. Law enforcement officers and deputized posse members were on the lookout for anything or anyone appearing suspicious.

On the late evening of September 17 and early morning of September 18, 1984 unmarked private posse vehicles patrolled the target area along I–70. Included in these vehicles was that of Emery County Jeep Posse deputies Carey Delpaiz and Julian Bowman. At approximately 12:30 a.m. they sighted a campfire just south of the interstate at mile marker 133 but they did not discern any people. A short time later, however, on the side of the road very near mile marker 133 where they had seen the fire, they observed a small cairn of stones. At this time two males, who turned out to be co-defendants, came running toward the deputies' car from the area where the fire had been seen. They were quite dirty and wearing t-shirts from the "Westwinds" truckstop in Green River, Utah. All the jeep patrols being in radio contact with each other, the deputies had been informed that another suspect arrested several hours earlier had also been wearing a "Westwinds" t-shirt. They detained the two individuals until a deputy sheriff arrived to take them into custody.

Late on September 17, volunteer posse members Randy Erwin and Dean King were also assigned to patrol the target

area on I–70. They saw nothing suspicious along the designated route until Erwin spotted something moving in the trees near mile marker 133 around 3:00 a.m. on September 18. Closer inspection revealed nothing significant.

Erwin and King continued patrolling for another twenty minutes when they got a call over the radio from another patrol car in the area advising that someone was hitchhiking or walking on the road between the Ranch Exit and the brake test area. Erwin and King travelled back to the area of mile marker 133.

Not realizing the posse's vehicle was associated with the authorities, the hitchhiking Alonso flagged it down at about 3:30 a.m. He was located a quarter mile east of mile marker 133. This was the precise spot where 2 co-defendants had been apprehended approximately three hours earlier, 100 to 200 yards east of where Erwin had seen the movement in the trees, and just east of the stacked stones on the shoulder of the road. Alonso was wearing a dirty jogging suit, carrying some clothes in his hand and, according to the deputies, "looked like he'd been out in the weeds, in the sand."

Suspicions aroused, posse members Erwin and King pulled over and were approached by Alonso. When asked where he was going, Alonso said he was headed to Green River to catch a bus. When asked where he had come from, Alonso said he had been "walking all day from Salina." Salina was approximately 80 miles away. At this point Alonso was detained until police officers arrived about 15 to 20 minutes later.

Three items of substantial evidentiary value were found on Alonso's person. First, a "Pathfinder's" compass identical to the one found on a co-defendant. Second, a round trip airline ticket, the first part of which had been used for a Denver to Grand Junction, Colorado flight. The ticket was bought, and used, on September 13, 1983, the very day other defendants had checked into a Grand Junction motel. Subsequent investigation showed Grand Junction to be

the staging area for the unloading crew. The airline ticket was in the name of F. Steffano, not Fabio Alonso. Aliases were also used by other defendants when checking into the Grand Junction motel. Third, shoes worn by Alonso which were comparable in design and degree of wear to shoe prints found near the aircraft.

Documentary evidence showed that all eleven suspects, including Alonso, arrested in vicinity of the trailer loaded with ten tons of marijuana were permanent residents of Miami or nearby communities. In addition, nine of the eleven, including Alonso, were Cuban.

## II. SUFFICIENCY OF EVIDENCE

### A. Ample Evidence Supports Alonso's Conviction

 Alonso contends that the evidence presented at his trial was insufficient to support his conviction. The jury's verdict of guilty, he argues, must be reversed. In evaluating this claim we must view the evidence, both direct and circumstantial, in the light most favorable to the prosecution. All reasonable inferences and credibility choices must be made in support of the jury's verdict. *United States v. Massey*, 687 F.2d 1348, 1351 (10th Cir.1982): *see also, United States v. Blitstein*, 626 F.2d 774, 776 (10th Cir.1980), *cert denied*, 449 U.S. 1102, 101 S.Ct. 898, 66 L.Ed.2d 828 (1981); and *United States v. Themy*, 624 F.2d 963, 965–66 (10th Cir.1980) ("The jury observed the prosecution and defense witnesses, appraised their credibility, determined the weight to be given to their testimony, drew permissible inferences therefrom, resolved conflicts in the evidence and reached ultimate conclusions of fact. Those are functions exclusively reserved for the trier of fact."). The evidence, direct and circumstantial with reasonable inferences drawn therefrom and construed in a light most favorable to the government, is sufficient if the fact finder may find the defendant guilty beyond a reasonable doubt. *United States v. Gay*, 774 F.2d 368, 372 (10th Cir.1985); *United States v.*

*Hubbard,* 603 F.2d 137, 142 (10th Cir.1979). "To be sufficient, the evidence must do more than raise a mere suspicion of guilt". *Gay,* 774 F.2d at 372. "If substantial evidence supports the verdicts, they cannot be set aside". *Themy,* 624 F.2d at 965.

Considering the evidence admitted at trial, it is manifest that a jury would find Alonso guilty beyond a reasonable doubt. The evidence supporting Alonso's conviction is clearly sufficient: Alonso's capture a mere stone's throw from mile marker 133 where two other defendants had been apprehended and where deputies saw a fire, movement in the trees and a rock marker alerting co-defendants to an emergency gathering point; Alonso's dirty appearance as one who had hid in the desert sand and sage for over 24 hours; Alonso's lacking upon apprehension clothes, toiletries, camping gear or even water, indicating he had lied about being a hitchhiker "on the road"; the incredibility of Alonso's story that he had walked all the way from Salina in such a short time and with none of the constantly cruising posse member's spotting him before his detention; Alonso's presence in the middle of desert wasteland only a few miles from ten tons of marijuana; the close proximity of Alonso's arrest to that of 10 other co-defendants; Alonso's being a Cuban, just like nine of the eleven people arrested in an area far removed from Cuban populations—or any other for that matter; Alonso's airline ticket reasonably inferring his presence in Grand Junction at the same time as the other defendants; Alonso's use of an alias in the plane ticket; Alonso's compass being the exact same make as that of a co-defendant; Alonso's footprints matching those found near the marijuana-laden DC-7. From this evidence a jury should and did find Alonso guilty beyond a reasonable doubt.

### B. *Reasonable Hypothesis Theory Rejected*

The punch of Alonso's challenge to the sufficiency of the evidence, however, is the assertion that when circumstantial evidence is relied upon, all of the inferences from that evidence must be consistent with guilt and inconsistent with every reasonable hypothesis of innocence. *United States v. Ferg,* 504 F.2d 914 (5th Cir.1974); *Montoya v. United States,* 402 F.2d 847 (5th Cir.1968).

Without delving into the present dubious validity of this theory in the Fifth Circuit, we are certain that it does not represent the state of the law in this circuit. The minority "reasonable hypothesis" theory has been unequivocally rejected by the Tenth Circuit:

> Evidence supporting guilt may be entirely circumstantial … circumstantial evidence may be accorded the same weight as direct evidence … the circumstantial evidence required to support a verdict need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt.

*United States v. Henry,* 468 F.2d 892, 894 (10th Cir.1972); *see also, Gay,* 774 F.2d at 373.

■ Alonso's argument lacks merit; the evidence upon which he was convicted is amply sufficient.

### III. SUPPRESSION ISSUES

#### A. *Standing to Assert Illegal Use of the Transponder*

By order of February 9, 1984 the district judge denied Alonso's motion to suppress evidence derived from the unlawful electronic surveillance by the transponder. Specifically, the trial judge held that "Ownership of the airplane was insufficiently proven. Absent ownership all defendants lack standing to attack the use of the transponder." Alonso now urges that this ruling was in error and that this case should be remanded with instructions to suppress.

■ When reviewing the denial of a motion to suppress, an appellate court must accept the trial court's findings of fact unless they are "clearly erroneous" and must consider the evidence adduced at trial in the light most favorable to the government. *United States v. Rios,* 611 F.2d 1335, 1344 (10th Cir.1979); *United*

*States v. Miles,* 449 F.2d 1272, 1274 (10th Cir.1971). In light of the evidence at the suppression hearing relating to the transponder's installation, its failure to be removed after its order had expired and Alonso's lack of a privacy interest in the plane, the trial court's finding that Alonso lacked standing to assert a Fourth Amendment violation is not clearly erroneous.

> The proponent of a motion to suppress has the burden of establishing that his *own* Fourth Amendment rights were violated by the challenged search and seizure.

*Rakas v. Illinois,* 439 U.S. 128, 130–31, n. 1., 99 S.Ct. 421, 423–24, n. 1, 58 L.Ed.2d 387 (1978) (emphasis added). In this context the Supreme Court has also stated that

> suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of the damaging evidence.

*Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 965–66, 22 L.Ed.2d 176 (1969). The focus in determining whether one's own Fourth Amendment right to be free from unreasonable search and seizure has been violated is whether that person has a reasonable or justifiable expectation of privacy in the area searched or items seized. *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); *Smith v. Maryland,* 442 U.S. 735, 740–41, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979).

The mode of inquiry employed in *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983) has given rise to a bifurcated analysis which is appropriate to Alonso's transponder claim. The *Knotts* court treated the installation of the transponder as totally distinct from its use in tracking a suspect. *See also, United States v. Erickson,* 732 F.2d 788 (10th Cir. 1984). In *Knotts* the Supreme court held that "a person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another". 103 S.Ct. at 185. The electronic beeper used in Knotts, enabling the government to track the defendant's automobile, revealed no more than could have been discerned by visual surveillance. As such, "scientific enhancement" of visual surveillance of a suspect on public thoroughfares "raises no constitutional issues which visual surveillance would not also raise". *Knotts,* 103 S.Ct. at 1087.

The rationale behind *Knotts* has been extended to airplanes:

> *Knotts* teaches us here that monitoring signals from an electronic tracking device that tells officers no more than that a specific aircraft is flying in the public airspace does not violate any reasonable expectation of privacy. Because this is so, no Fourth Amendment violation results from such public detection. The movement of an airplane in the sky, like that of an automobile on a highway is not something in which a person can claim a reasonable expectation of privacy.

*United States v. Butts,* 729 F.2d 1514, 1517 (5th Cir.1984); *see also, United States v. Bruneau,* 594 F.2d 1190 (8th Cir.1979), *cert. denied,* 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61 (1979); *Erickson,* 732 F.2d at 790. Since Alonso had no reasonable expectation of privacy in the movement of the DC–7 in public airways, the government's tracking the airplane with the transponder violated none of Alonso's Fourth Amendment rights.

Recognizing the bifurcated analysis, Alonso asserts that aside from the government's use of the transponder in tracking the DC–7, allowing the transponder to remain in place after the expiration of the order authorizing its use constitutes a warrantless search. Alonso argues that such government action, or inaction, is tantamount to a warrantless installation of the transponder. Like the analysis of the use of the transponder, the right to assert a Fourth Amendment claim with respect to its installation turns on privacy expectations. In *Erickson,* 732 F.2d at 790, this court addressed the issue of standing to

assert a Fourth Amendment claim with respect to the installation of a transponder:

> In *Rakas v. Illinois* ... the Supreme Court stated that one who owns or legally possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of ... [the] right to exclude [others].
>
> The question, then, is whether Erickson sufficiently showed lawful possession or control (of the airplane) to confer standing.

(Citations omitted and paranthetical phrases added.)

In *Erickson* FAA records showed that at the time of the beeper's installation, the plane was owned by Emery Air Freight. Although defendant Erickson had concocted a "fanciful" story of his part ownership of the plane, the court held that

> [n]o testimony showed that the defendant had anything to do with Emery Air Freight or that he was authorized by Emery to possess, use or fly the aircraft. Thus, defendant has failed to show lawful possession of the plane giving rise to a legitimate expectation of privacy.

*Erickson*, 732 F.2d at 790; *see also, Butts*, 729 F.2d 1514.

 In the instant case, the court order authorizing the use and placement of a transponder concededly expired by its own terms sixty days from its issue. The analysis, however, is not altered by the fact that the use of the transponder was essentially warrantless. If the defendant has no privacy expectation in the plane, due to want of ownership or the airplane's presence in the public airways, he has no standing to assert a Fourth Amendment claim. Standing may not be conferred by the government's activity, no matter how warrantless or illegal it might be, where no constitutionally protected right is violated.

In a pre-trial hearing on November 16, 1983, Supervisory Air Customs Officer Miller testified that in June of 1982 he was involved in the investigation surrounding the application for the transponder order. He stated that neither Alonso nor any of the co-defendants were suspects in the investigation or had any ownership or proprietary interests in the plane. The focus of the investigation, and whose activity gave rise to the probable cause necessary to the transponder order, was the plane's owner, Onyx Corporation. Officer Miller testified that the DC–7 departed from the United States on about June 18, 1982 and remained on foreign territories until its ill-fated flight into the United States on September 17, 1983.

John Sauer, Special Agent, Drug Enforcement Agency, testified at a December 2, 1983 pre-trial suppression hearing as to his investigation following the plane's re-entry into the country. Agent Sauer testified that Jack Richards, Onyx's president, claimed to have sold the DC–7 to "Frank Gonzales". This sale was neither authorized nor recorded by the FAA. From the time the transponder was used through the trial, the FAA recognized Onyx as the sole owner of record. Agent Sauer's investigation revealed that neither Alonso nor his co-defendants was "Frank Gonzales". At no time during his pre-trial hearings did Alonso or any of his co-defendants testify or otherwise prove that he had any proprietary interest in the plane, was "Frank Gonzales", associated with Onyx, or was in rightful possession of the plane at any time.

 The trial judge specifically found that "[O]wnership of the airplane was insufficiently proven". This finding of fact is well supported by the evidence and may not be overturned.

**B. Probable Cause for the Warrantless Arrest**

Alonso asserts that the trial court's denial of his motion to suppress evidence which was the product of his warrantless arrest was in error. He is wrong.

 Police officers may perform a warrantless personal search and conduct investigation incident to a lawful arrest without violating the Fourth Amendment. *Michigan v. DeFillipo*, 443 U.S. 31, 35, 99 S.Ct. 2627, 2630, 61 L.Ed.2d 343 (1979);

*United States v. Welker,* 689 F.2d 167, 168 (10th Cir.1982). The lawfulness of the search and the applicability of the exclusionary rule sought to be invoked by Alonso depends on the lawfulness of the arrest. *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *Welker,* 689 F.2d at 168; *United States v. Gagnon,* 635 F.2d 766, 769 (10th Cir.1980). The validity of the warrantless arrest depends on whether the arresting officers had probable cause to believe that Alonso had committed or was committing a crime. *United States v. Coker,* 599 F.2d 950, 952 (10th Cir.1979); *Beck v. Ohio,* 379 U.S. at 91, 85 S.Ct. at 225. Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to have the belief that an offense has been or is being committed by the person to be arrested. *Dunaway v. New York,* 442 U.S. 200, 208, n. 9, 99 S.Ct. 2248, 2254, n. 9, 60 L.Ed.2d 824 (1979); *Welker,* 689 F.2d 167.

▇ In a pre-trial hearing on motions to suppress statements and evidence obtained as a result of Alonso's warrantless arrest, the trial court held that "given the whole fabric of the circumstances ... there is reasonable and probable cause" for arrest. Unless, in construing all evidence in a light most favorable to the government, the trial court's finding of probable cause is clearly erroneous, it must not be disturbed. *Rios,* 611 F.2d at 1344; *United States v. Donahue,* 442 F.2d 1315, 1316 (10th Cir.1971).

There is some confusion in Alonso's brief as to whether he is challenging the posse deputies' detention or the sheriff's formal arrest. Alonso appears to argue that the deputies' detention of him constitutes arrest and it is their knowledge at the time of arrest which must be considered in determining the existence of probable cause. The government, on the other hand, insists that the deputies only detained Alonso and that the arrest, invoking Fourth Amendment rights, did not occur until the sheriff

arrived on the scene. The distinction, however, makes no difference.

▇ The deputies' detention of Alonso constituted an arrest, the legality of which hinges on the presence of probable cause. A seizure for Fourth Amendment purposes occurs where the suspect has a reasonable belief that he is not free to leave. *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). Alonso was told that he was not free to leave by the deputies; a Fourth Amendment seizure occurred at that point.

▇ Upon reviewing the facts and circumstances known to the deputies, we find no error in the trial courts' finding of probable cause. These facts were: all the various activities observed or known to have occurred in proximity to mile marker 133 where Alonso was arrested—movement in the trees, a campfire, stone markers, and the earlier capture of two co-defendants; Alonso's disheveled, furtive appearance; the incredibility of Alonso's claim that he had walked all the way from Salina given the distance to Salina and Alonso's lack of appropriate attire and gear for being "on the road"; Alonso's ethnic appearance similar to those already arrested.

We believe that the deputies had probable cause to arrest Alonso and that, therefore, the trial court's denial of Alonso's motion to suppress evidence derived from that arrest was not in error.

## IV. JURY INSTRUCTIONS

Alonso asserts that the trial judge's failure to issue a jury instruction to the effect that a defendant's "mere presence" at the scene is insufficient to sustain a conviction was in error and that this case should be remanded.

We disagree. As the government argues, "[i]t is not error to refuse to give a requested instruction if the same subject matter is adequately covered in the general instructions". *United States v. Miller,* 460 F.2d 582, 588 (10th Cir.1972). In an instruction similar to the one given in the present case, the *Miller* jury was informed

that in order to sustain its burden of proving the defendant aided and abetted a narcotics violation, there must be evidence of willful association and willful participation. Because "[t]he jury was adequately informed that it must find that ... (the defendants) ... actively participated in the crime", failure to give a "mere presence" instruction was not error. *Miller,* 460 F.2d at 588. (Paranthetical phrase added.)

 As well, in *United States v. Rojas,* 537 F.2d 216 (5th Cir.1976), the trial court refused to give an instruction that mere presence is insufficient to establish possession. The appellate court held this omission not to be error, where the instructions given clearly stated that possession required "either direct physical control or the power and intention to exercise dominion or control over the cocaine". *Rojas,* 537 F.2d at 220. The charge to the jury in the instant case, like *Rojas,* was "sufficient, if followed, to preclude conviction for mere presence or proximity". *Rojas,* 537 F.2d at 220.

Accordingly, the conviction is AFFIRMED.