**UNITED STATES of America, Plaintiff,**

v.

**Charlie ARMIJO, Defendant.**

**No. CR 91–0109–JB.**

United States District Court,
D. New Mexico.

Sept. 30, 1991.

---

David N. Williams, Asst. U.S. Atty., Albuquerque, N.M., for plaintiff.

Tim Padilla, Albuquerque, N.M., for defendant.

## MEMORANDUM OPINION AND ORDER

BURCIAGA, Chief Judge.

THIS MATTER came on for a hearing before the Court on August 5, 1991 on Defendant's motion to suppress evidence seized on February 23, 1991. Defendant, Charlie Armijo, moves to suppress the evidence arguing it was seized in violation of the Fourth Amendment to the United States Constitution.

The Fourth Amendment's mandate is clear and unequivocal. "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, *shall not be violated* ...." U.S. Const. amend. IV (emphasis added). While "[n]o right [was] held more sacred, or [was] more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all the restraint or interference of others, unless by clear and unquestionable authority of law," *Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891)), the import of the Fourth Amendment's words have been diluted with unrelenting rhetoric justifying increasingly intrusive means with the end of seizing drugs. "This Court, [however] ... is not empowered to suspend constitutional guarantees so that the Government may more

effectively wage a 'war on drugs.' " *Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991). After hearing the evidence presented on August 5, 1991, the following findings of fact compel this Court to enforce the Constitution's clear mandate and grant Defendant's motion to suppress.[1]

Amtrak trains travelling east from Los Angeles, California temporarily stop in Albuquerque, New Mexico. As part of a drug interdiction program, Albuquerque Police (APD) and Drug Enforcement Agents (DEA) routinely conduct investigative drug sweeps aboard these trains and on the station premises. As the trains pull into the station, disembarking passengers are scrutinized by armed, but plain-clothed, APD and DEA agents.

As part of this drug interdiction program, Kevin Small, a DEA agent, and APD officers board the trains and randomly question passengers and solicit permission to rummage through luggage in the hope of finding drugs. Instead of approaching those passengers seated in the coach section where the luggage is in plain view, Agent Small seeks out those passengers seated in the sleeper section for his stated reason that those passengers seek greater privacy.

As a result of the frequency of these sweeps, Agent Small has developed a working relationship with the train personnel who interact with the passengers and their luggage during the journey from Los Angeles to Albuquerque. Amtrak personnel provide him with the train manifest, containing the names and seating of the passengers, and other documents reflecting the destinations, points of departure, prices, method and time of payment for tickets. In return, Agent Small offers rewards to informants and train personnel for tips leading to successful drug seizures.

On Saturday, February 23, 1991, Agent Small received a tip from a confidential informant about possible drug couriers on the coach section of the Amtrak train arriving in Albuquerque from California. While other enforcement officers investigated this tip, Agent Small proceeded to the sleeper section of the train to undertake his typical investigation.

Agent Small testified that before he boarded the sleeper section of the train, a part-time Amtrak employee ("informant") who had previously acted as a confidential informant for Agent Small, told him a person he should talk to was carrying blue luggage and pointed to the Defendant, whom Agent Small later learned was Charlie Armijo. Agent Small also testified this informant was reliable because on two previous occasions he had volunteered information leading to successful drug seizures. The informant, on the other hand, testified Agent Small had requested information from him on at least ten previous occasions. Resolving this troubling inconsistency by finding the informant more credible as to the number of tips, the Court questions the reliability of the informant's tips in light of the previous eight or more unmentioned occasions which, inferentially, proved unreliable.

Far more disturbing, however, is the reason the informant directed Agent Small's attention to Mr. Armijo. The informant reported to Agent Small and another agent that there was a young, well-dressed Hispanic wearing a gold watch and gold ring travelling in the first class section. The informant testified that since young Hispanics rarely travelled first class, he suspected this Hispanic was a drug courier. Even after being afforded the opportunity on both direct and cross-examination, the informant failed to reveal any factors, other than Mr. Armijo's race, dress and first class seating, that justified his suspicions. Indeed, when asked to identify the Defendant in the courtroom, the informant, appearing puzzled, briefly studied the Hispanic defense lawyer, the Defendant and, after turning completely around in the witness chair and intently concentrating on the Court's law clerk, also obviously Hispanic,

---

1. On August 5, 1991, this Court issued preliminary findings of fact and conclusions of law. This opinion formalizes and incorporates those findings and conclusions and supplements them.

embarrassedly stated he was unable to determine which Hispanic was the Defendant.

Undaunted by the paucity and questionable nature of this information, Agent Small tailed Mr. Armijo all the way from the station platform to the parking lot where he observed Mr. Armijo hug his mother and load his luggage into the trunk of her car. Agent Small then approached and asked Mr. Armijo about the weather, whether he was on the train that had arrived, where he was travelling from, and whether Mr. Armijo still had his ticket. Mr. Armijo responded he was travelling from Pasadena and he no longer had his ticket with him. During these questions the trunk of the car was closed and Agent Small testified Mr. Armijo did not appear nervous. Although nothing seemed to justify Agent Small's suspicions, he continued to question Mr. Armijo.

During this interrogation, Agent Small, wearing plain clothes and concealing his weapon in a hip pouch, failed to identify himself until Mrs. Armijo asked Agent Small who he was and why he was asking so many questions. Only then did he identify himself as a DEA agent investigating the transportation of drugs from California aboard Amtrak trains. Subsequently, he requested Mr. Armijo's identification. After Mr. Armijo provided some identification, Agent Small compared it with the train manifest. Since Mr. Armijo's name did not appear on the manifest, Agent Small asked Mr. Armijo whether he travelled under an assumed name. Mr. Armijo, now appearing somewhat nervous to Agent Small, answered no.

Seizing upon this nervousness, Agent Small then told Mr. and Mrs. Armijo he had reasonable suspicion the bags Mr. Armijo loaded into the trunk contained marijuana and asked Mr. Armijo if he would consent to a search of the contents of his luggage. Mr. Armijo unequivocally declined.

Agent Small persisted and told Mr. Armijo he would detain the car and Mr. Armijo's mother, unless he surrendered the bags. Thereupon, Mr. Armijo reluctantly surrendered the bags to Agent Small. Agent Small then issued a receipt to Mr. Armijo

for the bags and informed the Armijos they were free to leave.

Agent Small detained the luggage and subsequently subjected it to a canine drug sniff. The dog alerted to *both* pieces of luggage, but a subsequent search revealed only one piece contained cocaine.

There are three different levels of police-citizen encounters, each requiring different degrees of Fourth Amendment scrutiny: consensual encounters, *Terry* stops, and arrests. *United States v. Evans*, 937 F.2d 1534, 1536 (10th Cir.1991). Often the lines between these police-citizen encounters are blurred and in some instances, as the one at hand, can rapidly escalate through all three levels.

The first, a consensual police-citizen encounter, is characterized by the voluntary cooperation of a citizen in response to non-coercive questioning. Since courts have found this to be a *de minimis* intrusion not amounting to a seizure, this type of encounter does not warrant Fourth Amendment scrutiny. *Id.* "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' ... the encounter is consensual and no reasonable suspicion is required." *Bostick*, 111 S.Ct. at 2385. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19, n. 16, 88 S.Ct. at 1879 n. 16, 20 L.Ed.2d 889 (1968). Thus, "[t]he crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have 'communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick*, 111 S.Ct. at 2387.

If a reasonable person would not feel free to ignore the police presence, the encounter escalates into a *Terry* stop, characterized as a *"brief, non-intrusive* detention during a frisk for weapons or preliminary questioning...."* *Evans*, 937 F.2d at

1536 (emphasis added). "It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in the traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry*, 392 U.S. at 16, 88 S.Ct. at 1877.

Although this is considered a seizure of the person within the meaning of the Fourth Amendment, it need not be supported by probable cause. Rather, in order to justify an investigatory stop, the officer need have only "specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime." *United States v. Cooper*, 733 F.2d 1360, 1363 (10th Cir. 1984). "Anything less would invite intrusions upon the constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction." *Terry*, 392 U.S. at 22, 88 S.Ct. at 1880.

▮ The law is clear that an individual's race cannot be the basis for reasonable suspicion. *See United States v. Bradley*, 923 F.2d 362, 365 (5th Cir.1991); *United States v. Anderson*, 923 F.2d 450, 455 (6th Cir.1991) (citing *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975)); *United States v. Clay*, 640 F.2d 157, 159 (8th Cir.1981). Furthermore, "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or a seizure." *See Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); *Brown v. Texas*, 443 U.S. 47, 52–53, 99 S.Ct. 2637, 2641–42, 61 L.Ed.2d 357 (1979).

▮ Police may not, in the name of investigating a person who is no more than suspected of criminal activity, carry out a full search of the person, his automobile or other effects. Nor may the police detain an individual's luggage unless the officer can articulate specific facts sufficient to give rise to reasonable suspicion the travel-er's luggage contains contraband. *United States v. Place*, 462 U.S. 696, 698, 103 S.Ct. 2637, 2639, 77 L.Ed.2d 110 (1983) (applying principles of *Terry* to detention of luggage). More importantly, the police may not seek to verify their suspicions by means approaching the conditions of arrest. The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. *Royer*, 460 U.S. at 499–500, 103 S.Ct. at 1324–25.

▮ If the intrusiveness of the investigation increases, the encounter escalates into an arrest which is characterized by highly intrusive or lengthy search or detention. *Evans*, 937 F.2d at 1536. An arrest is justified only when there is probable cause to believe a person has committed or is committing a crime. *Id.* "Probable cause to arrest exists where facts and circumstances within the arresting officer's knowledge and of which they have reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been or is being committed by the person to be arrested." *United States v. Alonso*, 790 F.2d 1489, 1496 (10th Cir.1986) (citing *Dunaway v. New York*, 442 U.S. 200, 208, n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979)).

As in every search and seizure case, the Court is faced with determining the level of police-citizen encounter involved and whether the Government has met its burden of demonstrating the constitutionality of that encounter. *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325. In the present case, the Government has failed to do so.

Initially, when Agent Small questioned Mr. Armijo about the weather, his trip, his ticket, and requested Mr. Armijo's identification, Mr. Armijo was not restrained by physical force or a show of authority. *Bostick*, 111 S.Ct. at 2386–88; *see also Royer*, 460 U.S. at 501, 103 S.Ct. at 1326 (request and examination of identification not a seizure). Accordingly, this level of questioning does not evoke Fourth Amendment scrutiny. *Id.*

■ However, the intrusiveness of this encounter rapidly escalated as Agent Small, having revealed he was a DEA agent, informed Mr. Armijo he had reasonable suspicion the bags in the trunk contained marijuana, requested permission to search the luggage and informed Mr. Armijo he would detain the car and his mother if he withheld his consent. After "taking into account all of the circumstances surrounding the encounter," this Court finds Agent Small conveyed that compliance was required and a reasonable person would certainly not feel free to leave. *Bostick,* 111 S.Ct. at 2387 (request for consent to search luggage is seizure if police convey message that compliance is required). As such, the questioning, *at a minimum,* matured into a *Terry* investigative stop and Mr. Armijo was seized for purposes of the Fourth Amendment. *Id.*

■ Having determined a seizure took place in the parking lot of the Amtrak train station, the Court must assess whether the seizure was a product of specific reasonable and articulable facts which could logically support an inference of criminal behavior. *Cooper,* 733 F.2d at 1363. In this case, the only factors Agent Small was able to articulate to support his suspicions were that Mr. Armijo was a young, well-dressed Hispanic travelling first class, that he appeared nervous after his name did not appear on the train manifest, and that he refused to consent to a search of his luggage. Clearly, however, neither Mr. Armijo's race nor his refusal to consent constitute reasonable suspicion that a crime was being committed. *See Bradley, supra; Royer, supra.* Essentially, then, Agent Small seized Mr. Armijo because he was young, well-dressed and appeared nervous when his name did not appear on the train manifest. This Court is unwilling, however, to reduce the meaning of reasonable suspicion to such a level. *Cf. Royer,* 460 U.S. at 497, 103 S.Ct. at 1323–24 ("we cannot agree with the State, if this is its

position, that every young man paying cash for a ticket to New York City under an assumed name and carrying two heavy American Tourister bags may be arrested and held to answer for a serious felony charge"). To do so would be to relegate reasonable suspicion to an unfounded hunch.

■ The Court also finds that when Agent Small demanded Mr. Armijo consent to a search of his luggage or the car and his mother would be detained, Agent Small effectively coerced Mr. Armijo's consent with conditions approaching an arrest. The intrusiveness of this threat clearly exceeds the bounds of a *Terry* stop characterized as *"brief"* and *"non-intrusive."* *Evans,* 937 F.2d at 1536 (emphasis added). Having found the information Agent Small possessed at the time he threatened to detain the car and its driver did not rise to the level of reasonable suspicion, Agent Small necessarily lacked sufficient information to rise to the higher standard of probable cause. Accordingly, this Court also finds the means Agent Small employed in his investigation exceeded *Terry* and constituted an arrest of Mr. Armijo without probable cause. As such, both the *Terry* stop and arrest violated Mr. Armijo's Fourth Amendment rights.

■ Having found the *Terry* stop and arrest of Mr. Armijo to be unsupported by either reasonable suspicion or probable cause, the Court must determine whether Mr. Armijo, nevertheless, voluntarily consented to the detention and subsequent search of his luggage. It is clear luggage may be detained or searched if the detention or search is conducted pursuant to voluntary consent. *United States v. Guglielmo,* 834 F.2d 866, 868 (10th Cir.1987); *Schneckloth v. Bustamonte,* 412 U.S. 218, 243, 93 S.Ct. 2041, 2056, 36 L.Ed.2d 854 (1973). In determining the voluntariness of consent, the Tenth Circuit employs a two-part test [2]:

---

**2.** In issuing its preliminary conclusions of law, the Court employed a three-part test announced in *Guglielmo.* However, the court in *United States v. Price,* 925 F.2d 1268 (10th Cir.1991), recently eliminated the third element in deter-

mining the voluntariness of consent, namely, that the courts indulge every reasonable presumption against waiver of fundamental constitutional rights. The elimination of this third element, however, does not impact the decision

1. there must be clear and positive testimony the consent was unequivocable and specific and freely given; and,

2. the Government must prove the consent was given without duress or coercion.

*Guglielmo*, 834 F.2d at 868; *United States v. Abbott*, 546 F.2d 883, 885 (10th Cir.1977); *Villano v. United States*, 310 F.2d 680, 684 (10th Cir.1962); *United States v. Price*, 925 F.2d 1268 (10th Cir.1991) (eliminating presumption against waiver of fundamental constitutional rights). Ultimately, the determination of voluntariness is a question of fact to be determined from the totality of circumstances. *Id.* at 1271.

In examining the voluntariness of consent in cases involving a preceding Fourth Amendment violation, the Court must also determine whether the consent "is sufficiently an act of free will to purge the primary taint of the illegal arrest [and this] depends upon whether it is voluntary in fact, which in turn depends upon the totality of circumstances surrounding the consent." *United States v. Maez*, 872 F.2d 1444, 1453 (10th Cir.1989). The issue then, is "whether ... the evidence ... has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 1453 (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). In making this determination the Court must evaluate the following factors: "[t]emporal proximity of the arrest and the confession [consent], the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct...." *Maez*, 872 F.2d at 1454 (citing *Brown v. Illinois*, 422 U.S. 590, 603–604, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975), and applying test to determine voluntariness of consent). "If consent is not sufficiently an act of free will to purge the primary taint of the illegal arrest, it must be suppressed as fruit of the poisonous tree." *Maez*, 872 F.2d at 1453.

 First, the Government failed to provide positive testimony that Mr. Armijo's consent was freely given without duress or coercion. *Price*, 925 F.2d at 1270. In fact, prior to being threatened that his car and his mother would be detained, Mr. Armijo unequivocally declined to consent to a search of his luggage. It was only after Agent Small's threat that Mr. Armijo reluctantly surrendered the luggage. It is clear, therefore, his consent was not voluntarily given. Additionally, the temporal proximity of Mr. Armijo's detention and arrest with his subsequent surrender of the luggage and the absence of any intervening circumstances, demonstrates his consent was tainted by his unlawful detention and arrest. Moreover, the fact that Agent Small threatened Mr. Armijo with detaining the car and his mother for the purpose of securing his consent confirms this conclusion. *Maez*, 872 F.2d at 1454. Accordingly, the Court finds Mr. Armijo's consent was not freely and voluntarily given and was tainted by the illegal arrest.

The Fourth Amendment protects not only those individuals haled into courts after unreasonable searches and seizures, but, more importantly, it protects the unknown innocent passenger subjected to such indiscriminate investigative sweeps. Although it may be a highly effective means of seizing contraband being transported from Los Angeles, a source city, to the East, "the effectiveness of a law enforcement technique is not the test of its constitutionality." *Bostick*, 111 S.Ct. at 2389. The mandate of the Fourth Amendment is simple. The means employed to achieve a just end must be reasonable. In this case, they clearly were not.

Wherefore,

IT IS ORDERED, ADJUDGED AND DECREED, that Defendants' motion to suppress be, and hereby is, granted.

---

of this Court since even without presuming Mr. Armijo would not waive his Fourth Amendment rights, the Government failed to meet the first two elements announced in *Guglielmo* and continued in *Price*. Accordingly, the Court's opinion merely reflects the current status of the law.