**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**Filed 4/22/96**

**TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,      )
                                       )

     Plaintiff-Appellee,        )
                                       )

v.                               )     No. 95-8042
                                       )

RONALD LLOYD SNOW,         )
                                       )

     Defendant-Appellant.     )

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. No. 94-CR-27)**

_____

Patrick J. Crank (David D. Freudenthal, United States Attorney, and John R. Green, Assistant United States Attorney, with him on the brief) United States Attorney, Cheyenne, Wyoming, for Plaintiff-Appellee.

Rachel Recker Rouse (Daniel G. Blythe with her on the briefs) of Rogers, Blythe & Lewis, Cheyenne, Wyoming, for Defendant-Appellant.

_____

Before **BALDOCK, McWILLIAMS** and **BRORBY**, Circuit Judges.

_____

**BRORBY**, Circuit Judge.

_____

Ronald Lloyd Snow was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and theft of a firearm from a federally licensed firearm dealer in violation of 18 U.S.C. § 922(u), and he was sentenced to sixty-six months incarceration. Mr. Snow appeals his conviction alleging the district court committed four errors during the trial. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

On December 9, 1993, Mr. Snow entered the Coast to Coast Hardware store in Torrington, Wyoming. Debra Raben, an employee, testified Mr. Snow purchased a file and then left. The next day, Mr. Snow returned to the store. This time Mr. Snow asked Ms. Raben to remove a .45 semi automatic gun from the display case for him to examine. The display case had to be opened from behind the counter, but opened easily. After inquiring about the price of the gun, he handed it back to Ms. Raben and asked to see a shotgun. She returned the gun to the display case and handed him a shotgun. Mr. Snow then stated he wanted to look at some knives that were in a cabinet next to the display case containing the guns. Ms. Raben went to the front of the store to wait on other customers. Later she heard the door to the cabinet containing the guns move and noticed Mr. Snow was leaning over the cabinet with his hand behind the counter. She immediately approached Mr. Snow, who had his back to her, and asked if there was anything else he wanted to see. At first he said no, but then he inquired about picture mountings. Ms. Raben escorted him to the picture mountings at which point he said he wanted to look around some more, so she left him and went back to examine the gun display case. At this point she noticed the case was in disarray. After obtaining the help of a coworker she noticed the gun Mr. Snow had just been examining and two magazine clips were missing. Mr. Snow was no longer in the store.

Ms. Raben immediately called the police to report the suspected theft. She described Mr. Snow as wearing jeans "a coat that came down to his knees, it was a jean -- a denim-type material and then it had the brown corduroy cutoffs, and he had long hair, kind of bald on top and a beard." The police noted she also stated the suspect was a white male carrying a black satchel. After taking the description, several officers patrolled the store's immediate vicinity. Minutes later, the officers received a dispatch reporting a 911 call from St. Joseph's Children's Home regarding an individual matching Ms. Raben's description of the suspect. An officer responding to the dispatch call arrived at St. Joseph's and saw a man fitting Ms. Raben's description take a dark object out of a black satchel and stuff it down the front of his pants before walking towards the back of St. Joseph's. When the man began to run towards St. Joseph's, the officer stepped out from behind his cover, raised his gun and told the man to stop. When the man stopped, another police officer told him to get on the ground, which he did. The other officer then handcuffed him. The officers then rolled him over and found the missing semi-automatic weapon stuffed in the front of his pants. Mr. Snow was then taken to the Torrington Police Department. Fingerprint cards were used to determine that Mr. Snow had been convicted of a felony in Oregon. After a four- day trial, the jury found Mr. Snow guilty of being a felon in possession of a firearm and of theft of a firearm.

Mr. Snow raises four issues on appeal: (1) whether the district court erred when it refused to modify jury instructions 14, 16, 25 and 26 to require the jury to find an interstate or foreign commerce connection; (2) whether the testimony of the Federal Bureau of Alcohol Tobacco and Firearms agent that the gun manufacturer told him the firearm model in question was imported denied the defendant his right of confrontation and was hearsay; (3) whether it was error for the court

3

to deny the defendant's motion to suppress, and (4) whether the entry into evidence of a fingerprint card was error due to its testimonial nature.

I

Mr. Snow argues the district court erred when it refused to modify certain jury instructions to include a reference to commerce.

> We review the district court's refusal to give a particular jury instruction for abuse of discretion. In assessing whether the court properly exercised that discretion, a reviewing court must examine the instructions as a whole to determine if they sufficiently cover the issues in the case and focus on the facts presented by the evidence. The question of whether a jury was properly instructed is a question of law, and thus, our review is *de novo*.

*United States v. Lee*, 54 F.3d 1534, 1536 (10th Cir.) (citation omitted), *cert. denied*, 116 S. Ct. 247 (1995).

Mr. Snow was convicted of violating 18 U.S.C. § 922(u) which provides:

> It shall be unlawful for a person to steal or unlawfully take or carry away from the person or the premises of a person who is licensed to engage in the business of importing, manufacturing, or dealing in firearms, any firearm in the licensee's business inventory that has been shipped or transported in interstate or foreign commerce.

The trial court instructed the jury that:

> The phrase "in or affecting commerce" and "which had been shipped or transported in interstate ... commerce" "includes commerce between any place in a State and any place outside of that State."

> The government may meet its burden of proof on the question of being "in or affecting commerce" or "which had been shipped or transported in interstate ... commerce" by proving to you, beyond a reasonable doubt, that the firearm identified in the indictment, at any time, had travelled across a state boundary line.

4

Mr. Snow sought to add the phrase "in commerce" or "by commerce" to the end of the sentence under the justification that "just crossing a state line is not in commerce." Mr. Snow also sought to modify two related jury instructions in such a way as to require the prosecution to prove that the firearm traveled through interstate commerce "in a commercial transaction" or "commercially" or "in a manner affecting commerce." The district court denied his requests stating the language used was the standard jury instruction language and "[a]ll the time I have been on the bench this is the one we've used, and we've never put 'in commerce' in there."

Mr. Snow attempts to use the Supreme Court's ruling in *United States v. Lopez*, ___ U.S. ___, 115 S. Ct. 1624 (1995), to argue that it is a question of fact whether taking a firearm from a federally licensed firearms dealer could have an interstate commerce connection. We agree with Mr. Snow that whether the firearm was shipped or transported in interstate commerce is a question of fact for the jury. We disagree with him, however, regarding what needs to be proven to establish this fact. Mr. Snow's reliance on *Lopez* for the proposition that merely proving the firearm crossed a state boundary line does not prove the firearm crossed the state line as part of interstate commere is misplaced. In *Lopez*, the Supreme Court found Congress had exceeded its authority under the Commerce Clause in enacting the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q), because the act did not have an interstate commerce element. Mr. Snow has not meaningfully articulated a constitutional challenge to § 922(u). But even if he had, it would fail. In *Lopez* the Supreme Court invalidated the statute after finding it "has nothing to do with 'commerce' or any sort of economic enterprise" and could not "be sustained under our cases upholding regulations of activities that arise

5

out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce." *Lopez,* 115 S. Ct. at 1630-31. The Supreme Court also noted that § 922(q), the statute under review, "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 1631. In contrast, the plain language of § 922(u) requires that the firearm have been shipped or transported in interstate commerce thus, it "contains an interstate-commerce nexus as an essential element of the offense and thus ensures that the firearm in question affects interstate commerce." *United States v. Miller*, 74 F.3d 159, 160 (8th Cir. 1996); *see also United States v. Bolton*, 68 F.3d 396, 400 (10th Cir. 1995) (holding 922(g)'s jurisdictional element that the firearm have been in or affected commerce sufficient to withstand a *Lopez* attack), *cert. denied*, 116 S. Ct. 966 (1996).

Not only is Mr. Snow's contention that in order to satisfy the "shipped or transported in interstate commerce" requirement of §922(u) the firearm must have been expressly shipped or transported for a commercial purpose or as part of a commercial transaction unsupported by *Lopez*, it is also contrary to well-established precedent. The Supreme Court has long held the "[i]mportation into one State from another is the indispensable element, the test, of interstate commerce." *International Text-Book Co. v. Pigg*, 217 U.S. 91, 107 (1910). In *Archambault v. United States*, 224 F.2d 925, 928 n.3 (10th Cir. 1955), we noted Congress's power

> "to regulate commerce is not confined to commercial or business transactions. From an early date such commerce has been held to include the transportation of persons and property no less than the purchase, sale, and exchange of commodities, *United States v. Hill*, 248 U.S. 420, 423 [(1919)], and goods may move in commerce though they never enter the field of commercial competition. For example, the movement of people across State lines and the unrestricted ranging of cattle across two States is commerce. The interstate transportation of whiskey for personal consumption, of

> a woman from one State to another for an immoral purpose without any element of commerce, of a kidnapped person or a stolen automobile -- all constitute interstate commerce in the constitutional sense.  These cases, we think, make it clear that interstate commerce is not limited to interstate trade."

(Quoting *Bell v. Porter*, 159 F.2d 117, 119 (7th Cir. 1946) (footnote omitted)).  The above language shows that whether the firearm in question was transported for commercial or personal reasons is irrelevant; simply by crossing state lines the firearm traveled in interstate commerce.  *See United States v. Ohio Oil Co.*, 234 U.S. 548, 560 (1914) (holding that the transportation of one's own goods from state to state is interstate commerce).  The challenged jury instructions accurately stated the law in this respect.

Mr. Snow also lists jury instruction 14 in his appeal, but he does not provide any argument as to why it was improper.  We also see no evidence that he objected to Jury Instruction Number 14 at the district court level.  When a party fails to object to an instruction at trial, we will only review for plain error.  *United States v. Davis*, 55 F.3d 517, 519 (10th Cir.), *cert. denied*, 116 S. Ct. 249 (1995).  We have read instruction Number 14, which defines a firearm, and do not find that it constitutes plain error.

The district court did not abuse its discretion in giving the challenged jury instructions.

II

Mr. Snow next claims certain testimony of the prosecution's expert witness in firearms constituted inadmissible hearsay which violated his Sixth Amendment right to confront those who

testify against him. Evidentiary rulings are committed to the sound discretion of the trial court and our review is thus limited to abuse of discretion. *United States v. Zimmerman*, 943 F.2d 1204, 1211 (10th Cir. 1991). While we review evidentiary rulings by considering the record as whole, in the case of hearsay objections our deference to the trial judge is heightened. *Boren v. Sable*, 887 F.2d 1032, 1034 (10th Cir. 1989). In determining whether the district abused its discretion, and if so, whether the district's abuse of discretion constituted harmless error, our inquiry is not limited to whether the record without the inadmissible statements is sufficient to support the conviction, but "[r]ather, we must discern whether the statements, in light of the whole record, 'substantially influenced' the outcome of the trial, or whether we are left in 'grave doubt' as to whether it had such an effect." *United States v. Tome*, 61 F.3d 1446, 1455 (10th Cir. 1995) (quoting *United States v. Birch*, 39 F.3d 1089, 1094 (10th Cir. 1994)). When the error complained of is constitutional in nature, we must be persuaded that the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24 (1967); *United States v. Begay*, 937 F.2d 515, 524 (10th Cir. 1991). The Supreme Court advanced a two-part test in *Idaho v. Wright*, 497 U.S. 805, 816 (1990), to determine whether hearsay violated an accused's constitutional right to confrontation. First, "[t]he Confrontation Clause is not violated if the hearsay statement falls within a firmly rooted hearsay exception; and [second] even if it does not fall within such an exception, hearsay testimony is not violative of the Confrontation Clause if it is supported by a showing of particularized guarantees of trustworthiness." *United States v. Jefferson*, 925 F.2d 1242, 1254 (10th Cir.) (quotation marks omitted), *cert. denied*, 502 U.S. 884 (1991).

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or

hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. Hearsay is generally not admissible unless it falls under a specific exception. Fed. R. Evid. 802. At trial, the district court overruled Mr. Snow's hearsay and confrontation objections to the following dialogue that transpired between the prosecution and its expert witness, an agent with the federal bureau of Alcohol, Tobacco and Firearms, on redirect examination:

> Q: And what did you do in regard to the record history of the gun with the manufacturer?
>
> A: I contacted the Sig Arms corporation in Exeter, New Hampshire to find out when this firearm was basically manufactured and how it was imported into the United States.
>
> Q: And what if anything did you find from that inquiry?
>
> ....
>
> A: This weapon has been imported basically since the early 1980s. There have only been two importers of this weapon. The very initial importer was Interarms Importers and they were out of Alexandria, Virginia.
>
> Then the Sig Corporation started their American corporation. It is now called Sig Arms, Incorporated. They have three locations in the United States.... And those are the only places Sig Arms have ever been imported into the United States.
>
> Q: So those are places of import into the United States?
>
> A: Yes, sir.
>
> Q: All of those are located outside the state of Wyoming?
>
> A: Yes, sir, they are.

We need not elaborate on the admissibility or constitutionality of the above exchange because even if we were to assume the above testimony was inadmissible hearsay which violated Mr. Snow's

9

constitutional right to confrontation, we are convinced beyond a reasonable doubt such error was harmless. As we noted above, all the prosecution needed to prove was that the firearm had at some point crossed a state line. On direct examination, the agent established there are only two gun manufacturers in Wyoming, neither of which manufacture the type of weapon Mr. Snow was charged with stealing and possessing. In addition, the agent testified from personal knowledge, that the gun in question was the same type of gun he carried and it was manufactured as part of a joint venture between a Swedish and a German owned company in West Germany. Finally, it was also brought to the jury's attention that the gun itself was stamped "made in West Germany". The above, unrefuted and unchallenged evidence, was more than enough to establish that at some point the gun had to have crossed state or national lines in order to have been available for sale in Wyoming. *See United States v. Overstreet*, 40 F.3d 1090, 1095 (10th Cir. 1994) (finding evidence that no revolvers are manufactured in Oklahoma sufficient to prove that revolver recovered in Oklahoma had traveled in interstate commerce), *cert. denied*, 115 S. Ct. 1970 (1995). The brief exchange on redirect did not prejudice the jury or taint the earlier evidence, rather, it was a minor addition to the prosecution's already overwhelming proof that the gun had to have been brought into Wyoming from somewhere else.

III

Next, Mr. Snow claims the district court should have granted his motion to suppress the firearm, as the fruit of an illegal arrest. Mr. Snow claims the officers lacked the probable cause necessary to support a warrantless arrest. After the evidentiary hearing, the district court made a careful review of the facts before denying Mr. Snow's motion to suppress the firearm. In particular

10

the district court noted Ms. Raben's account of the suspicious circumstances surrounding Mr. Snow's involvement with the firearm, and the police officer's own observation of Mr. Snow rummaging through a black satchel and then hiding an object in his waistband before holding:

> [W]hile the defendant was correct that there is no *direct* evidence that connects the defendant to the gun, the other evidence supports a reasonable inference, a form of circumstantial evidence, that can be added to the mix of circumstances that lead this Court to conclude that the defendant did in fact steal the weapon. For all of these reasons, the Court finds that there was probable cause to arrest the defendant in this case.

In reviewing the grant or denial of a motion to suppress, we must accept the district court's factual findings unless they are clearly erroneous. *United States v. McSwain*, 29 F.3d 558, 560 (10th Cir. 1994). We view the evidence in the light most favorable to the prevailing party. *United States v. Pena*, 920 F.2d 1509, 1513 (10th Cir. 1990), *cert. denied*, 501 U.S. 1207 (1991). However, whether the challenged conduct is reasonable under the Fourth Amendment is a legal question we review *de novo*. *United States v. Horn*, 970 F.2d 728, 730 (10th Cir. 1992).

"Law enforcement personnel may arrest a person without a warrant if there is probable cause to believe that person committed a crime." *United States v.* Wright, 932 F.2d 868, 877 (10th Cir.), *cert. denied*, 502 U.S. 962 and 972 (1991); *United States v. Watson*, 423 U.S. 411, 417 (1976). To determine whether probable cause existed, we look to see "whether at that moment the facts and circumstances within [the officer's] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [officer] in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). "Probable cause must be evaluated in light of circumstances as they would have appeared to a prudent, cautious,

11

trained police officer." *United States v. Morgan*, 936 F.2d 1561, 1568 (10th Cir. 1991), *cert. denied,* 502 U.S. 1102 (1992). Because the determination of whether probable cause exists is primarily a factual question, "'[u]nless, in construing all evidence in a light most favorable to the government, the trial court's finding of probable cause is clearly erroneous, it must not be disturbed.'" *Id.* at 1569 (quoting *United States v. Alonso*, 790 F.2d 1489, 1496 (10th Cir. 1986)).

In the present case, the district court relied on uncontradicted testimony which established: 1) Mr. Snow had been in the store examining the firearm shortly before it was stolen; 2) Mr. Snow was witnessed leaning over the counter "in a place where he had no business being"and reaching behind the gun display case when the clerk heard the gun cabinet door move; 3) although there were two other customers in the store, neither of them expressed any interest in the guns; 4) police were provided with a description matching Mr. Snow as a suspect in the theft of the firearm; and 5) police observed a man matching Mr. Snow's description take an object from a black satchel, hide it in the waistband of his pants and begin to run towards the door to a children's home. In light of the above evidence, we are unable to find clear error in the district court's determination that the police had probable cause to arrest Mr. Snow.

IV

Finally, Mr. Snow claims the entry into evidence of a fingerprint card was error due to its testimonial nature. Mr. Snow's counsel objected at trial to the admission of the fingerprint card because it contained Mr. Snow's signature. He claimed the signature constituted a testimonial act of Mr. Snow during interrogation and was therefore inadmissible either as an admission or because

Mr. Snow had not been reread his *Miranda* rights immediately prior to signing the card. The district court overruled his objection holding counsel was "stretching the testimonial value of the signature. I don't think it is testimonial at all. I believe it merely identifies the fingerprints."

We review the district court's admission of evidence for abuse of discretion. We will not disturb a district court's decision unless we have "'a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances.'" *United States v. Acosta-Ballardo*, 8 F.3d 1532, 1534 (10th Cir. 1993) (quoting *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986)).

The only information contained on the fingerprint card was Mr. Snow's signature, Mr. Snow's fingerprints, the signature of the official who took the fingerprints and the date they were taken. *Miranda* warnings protect suspects from having their constitutional rights violated by establishing a safeguard to ensure that any information elicited by police as the result of a custodial interrogation cannot be introduced against a defendant unless the suspect has been advised of and waived certain, basic constitutional rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *Parson v. United States*, 387 F.2d 944, 946 (10th Cir. 1968). *Miranda* does not apply to the case at bar, however, because "there is no constitutional right not to be fingerprinted." *Snow v. Oklahoma,* 489 F.2d 278, 280 (10th Cir. 1973); *Schmerber v. California*, 384 U.S. 757, 764 (1966). Furthermore, we have held that fingerprinting is nontestimonial in nature and may therefore be taken as part of proof of identification. *United States v. Peters*, 687 F.2d 1295, 1297 (10th Cir. 1982) (en banc). In fact, the refusal to have fingerprints taken can be treated as a waiver of identification. *Id.* By signing the

13

fingerprint card, Mr. Snow was simply following the standard procedure associated with fingerprinting. His signature was merely a part of the process of identification and was not testimonial in nature or information elicited as part of a custodial interrogation. *See United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985) (holding "a request for routine information necessary for basic identification purposes is not interrogation under *Miranda*"); *United States v Sims*, 719 F.2d 375, 378 (11th Cir. 1983) (same), *cert. denied*, 465 U.S. 1034 (1984); *United States ex rel. Hines v. LaVallee*, 521 F.2d 1109, 1112 (2d Cir. 1975) (same), *cert. denied*, 423 U.S. 1090 (1976). In light of the above, we do not find the district court abused its discretion in admitting the fingerprint card with Mr. Snow's signature.

IV

For the reasons stated above the district court's rulings are **AFFIRMED**.